2020 UT App 110

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TRAVIS A. COVINGTON,
Appellant.

Opinion
No. 20180641-CA
Filed July 30, 2020

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
No. 141500282

Gary W. Pendleton and Trevor D. Terry, Attorneys
for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Travis A. Covington was found guilty of aggravated abuse of a disabled adult. Asserting that the State presented insufficient evidence at trial to support his conviction and that he was prejudiced by the joinder of his trial with that of his wife, Covington appealed. We affirm.

## BACKGROUND

¶2 Covington and his then-wife had a son (Victim) in January 1992. Victim was diagnosed as autistic at an early age. His parents divorced, and Covington received full custody of

Victim in 1996. Covington married another woman (Wife) in 1999.

¶3     Wife consulted the internet to develop a special diet suitable for Victim.[1] Covington, who worked as a certified nursing assistant and apparently agreed with Wife that Victim needed a special diet, followed that diet in feeding Victim for the next ten years. Victim's younger siblings were not placed on the special diet.

¶4     Covington's sister (Aunt) testified that on the occasions that she dined with Covington's family, Victim was not allowed to associate with his siblings and had to sit by himself. Victim's grandfather (Grandfather), who lived near the Covingtons, noticed that Victim was "ostracized" and "not allowed to do some things that the other kids were allowed to do." During one visit, Grandfather noticed a lock on the outside of Victim's bedroom door. Covington told Grandfather the lock was "to keep [Victim] from getting out in the night and getting into the fridge" to eat "lunch meat and stuff . . . that he was craving." Grandfather noticed Victim began losing weight and told Covington that he "was concerned that . . . [Victim] was getting too thin," eventually placing a strain on his relationship with Covington to the point that Grandfather no longer had contact with Victim. Aunt also told Covington and Wife that Victim needed to be fed more.

¶5     After working as a nursing assistant for twenty-four years, Covington lost his job at a hospital in Las Vegas, Nevada.

---

1. The diet was intended to address Victim's perceived allergic reactions to dairy products and dyes used in processed foods. It was free of wheat and dairy products and low in preservatives, sugar, salt, MSG, and certain fruits. It also prohibited microwave use and exposure to electromagnetic fields and recommended using high-grade stainless steel and iron pans. It allowed Victim to eat chicken, salmon, potatoes, brown rice, a variety of vegetables, and certain fruits.

The family—composed of Covington, Wife, Victim, and six children born of the marriage between Covington and Wife—then adopted a semi-nomadic lifestyle, living in a travel trailer and selling novelty items at various recreational venues. Wife assumed the duties of homeschooling all the children and the household chores, and Covington did all the cooking for the family.

¶6 In December 2013, Covington rented a vendor's booth for an upcoming event in Quartzite, Arizona, and the family traveled there because the show was a "big money maker" that Covington anticipated would "subsidize [the family's] income for the whole year." Around the same time, Covington began to worry that Victim's health was deteriorating, so much so that he began talking to his sisters about Victim's condition. Aunt, who lived in Hurricane, Utah, thought Victim, who was then twenty-two years old and stood five feet and one inch tall, should come and stay with her "because she already had some autistic kids" and felt she might be better equipped to "handle [Victim's] autism."

¶7 On the evening of January 7, 2014, while the family was still in Quartzite, Victim collapsed in the travel trailer and was transported to LaPaz Regional Medical Center (LaPaz) in Parker, Arizona. Records from LaPaz listed Victim's weight as eighty pounds. Victim was diagnosed with hypoglycemia, treated, and discharged about two hours later. On discharge, Covington was instructed in writing to "increase [Victim's] fluids and food intake," "follow up with family [doctor]," and "return as necessary." Covington signed the discharge papers and verbally expressed that he understood the care instructions pertaining to Victim. But after this incident, Covington never took Victim to a doctor again.

¶8 A few days after the visit to LaPaz, Covington called Aunt and told her that Victim "had a sugar drop, had to go to the ER." Covington asked if Victim could come to Aunt's house for a time so she could temporarily take "care of him and spend one on one time with him." Covington mentioned that Victim needed to

gain weight but did not mention the discharge instructions or any other health concerns raised during Victim's prior medical visit. Aunt told Covington that she "didn't feel right about taking" care of Victim unless he was "doing . . . better," but she told Covington that she was willing to take in Victim if his condition improved. Aunt subsequently received two texts from Covington indicating that Victim "was doing better."

¶9     The family then made its way to St. George, Utah, to visit Wife's ailing father, arriving in the evening of January 16, 2014. Wife's father died a few days later, and the family attended the funeral on January 25. The record does not indicate the precise location of Victim at all times during this period, but Covington testified that he traveled between Utah and Nevada several times:

> We had to go back and forth all over, because we had to do . . . storage in Mesquite, Nevada. We had to go take care of taxes, multiple things. So I wasn't stuck in one spot. I had to keep to going back—I was going back and forth between Arizona and Nevada, back to Utah to see [Wife's] dad again, and then back over to try to get the taxes submitted, and then back over to see her dad, and then back over to try to do storage . . . .

Additionally, the record is clear that Covington rented a space in an RV park in Hurricane early in the day of February 2, 2014.

¶10     Around noon of that same day, Covington took Victim to Aunt's house in Hurricane. Aunt testified that Victim looked very thin and seemed weak to the point that "he was having a hard time walking." Aunt testified that Covington carried in Victim's belongings, sat him at the table, and gave him "an orange and . . . some sort of cereal or something." Aunt's husband (Uncle), who had seen Victim a year earlier, testified that Victim had "lost a lot of weight" and "was having a hard time walking" to the point that he had to use both hands to

grasp the stair railing to ascend the stairs. Covington told Aunt and Uncle that Victim had been "having accidents," but he did not mention any other health concerns. Covington and Wife, along with the other children, returned to Aunt's house a few hours later; Wife gave Aunt a copy of Victim's diet, and Covington brought some groceries for Victim.

¶11 Later that evening, Uncle served Victim a meal of two baked potatoes covered with chili and green beans. Victim cleaned the plate. On Monday, February 3, Aunt weighed Victim on her bathroom scale; he weighed fifty-two pounds. Victim ate everything he was given for breakfast, lunch, and dinner without incident. Aunt testified that she "tried the best that [she] could" to adhere to the diet given to her for Victim.

¶12 Covington's cousin (Cousin) visited Aunt, Uncle, and Victim that evening, and he was taken aback by Victim's appearance: "He looked real tiny. Very, very thin. What was really strange was his just—how close the skin fit the contours of his skull and around his teeth and everything." After leaving, Cousin kept "mulling over" the situation: "I was worried, because to me, he—he looked to me like he was really near death. That's what it seemed to me like, and I was afraid for [Aunt] and [Uncle] for one thing. I was afraid that he was going to pass away . . . ." The next morning, Cousin called his ecclesiastical leader (Leader), and after some discussion, it was agreed "that somebody needed to take [Victim] to" an urgent care facility.

¶13 Grandfather met Leader, Cousin, Uncle, and Victim at the urgent care facility. Grandfather, who had not seen Victim in three years, described Victim: "He [was] just flesh covered bones standing there. I've never seen anybody that skinny in my life, and it scared me." It was determined that Victim's condition was too serious for the urgent care facility, so Grandfather drove him to the emergency room of a hospital (Hospital) in St. George, Utah.

¶14   A police officer took photographs of Victim at the urgent care facility. The officer was troubled by Victim's appearance, describing it as "alarming" and saying he was "very emaciated, extremely thin."

¶15   Covington attempted to visit Victim at Aunt's house, but he was met there instead by a police officer, who informed Covington that there were "concerns" and that Victim had been taken "over to a facility and they were checking him out." When Covington arrived to visit Victim at the Hospital, he was arrested.

¶16   On admission to the Hospital, Victim weighed fifty-five pounds, and the emergency room doctor said it was "readily apparent" that Victim was "severely cachectic," meaning that he was "[w]asting away" with a "lack of muscle mass, lack of subcutaneous tissue, [and] protuberance of bony structures." In addition to being malnourished and underweight, the doctor found that Victim was severely dehydrated and exhibited alarming lactic acid levels, a condition the doctor said was potentially life-threatening if left untreated. Victim was given the maximum amount of saline solution to treat his dehydration. In addition, the doctor was "concerned about" lab tests showing Victim's low hemoglobin, low potassium, low glucose, low creatinine, and elevated liver enzymes. X-rays further revealed that Victim had a pneumomediastinum, which the doctor testified "can be [an] absolutely life threatening" condition in which air leaks out of the esophagus, trachea, or lungs and into the chest cavity. The doctor also testified that there was no indication in the emergency room medical records or from his observations that Victim was suffering from diarrhea when he was admitted. The admitting doctor who took over Victim's care ordered additional testing of Victim's electrolyte levels.

¶17   The primary care doctor (Treating Physician), who treated Victim for the remainder of his stay (February 6–9, 2014) at the Hospital, testified that Victim's "overall . . . critical kind of condition" worried her "very much." Specifically, she identified his emaciation, malnutrition, elevated enzymes indicating liver

inflammation, abnormal electrolyte levels, pneumomediastinum, and failure to thrive as disconcerting.

¶18 Treating Physician testified that Victim met the definition of malnourishment on several grounds. First, Victim experienced extreme weight loss over a short period of time, losing twenty-five pounds in four weeks or thirty-one percent of his body weight. Second, Victim had a significant loss of muscle mass. Third, Victim did not have any subcutaneous fat that Treating Physician could detect.

¶19 Treating Physician testified that Victim showed indications of having refeeding syndrome.[2] She noted that refeeding syndrome refers to a "spectrum of metabolic disturbances when an individual," after a "lack of energy intake or food intake for a prolonged period of time," begins eating again. Without controlled food intake, individuals with refeeding syndrome might have severe imbalances in electrolytes, possibly resulting in cardiac arrest and even sudden death. Among the indications that Victim had refeeding syndrome were his low electrolyte readings, specifically low calcium, low magnesium, low potassium, and low phosphorus, which Treating Physician testified is "the hallmark of refeeding syndrome." Victim was also anemic, had a low blood count, and had elevated liver enzymes. Based on all these factors, Treating Physician stated that in her professional opinion, Victim was experiencing refeeding syndrome.

¶20 Treating Physician indicated that Victim faced two scenarios if he had not been brought to the Hospital: (1) continue to lose weight or (2) be provided with more food than his body

---

2. "Refeeding syndrome is a serious and potentially fatal condition caused by sudden shifts in the electrolytes that help the body metabolize food when food is re-introduced after malnourishment or starvation." *Commonwealth v. Schlabig*, No. 3815 EDA 2017, 2018 WL 3544880, at *4 n.5 (Pa. Super. Ct. July 24, 2018).

could handle. She explained that both scenarios were "very dangerous" for Victim. If he continued to lose weight, his body would start "to break down his internal organ[s]" and he would experience organ failure "within a week or a month." And if Victim were to eat a sufficient amount of food in his malnourished condition, then he would develop refeeding syndrome, and the imbalance in his electrolytes would "probably cause him a sudden death." She concluded, "So [under] both of the scenarios, it was very dangerous if he was not treated in the [H]ospital. For that matter, I feel that bringing him to the [H]ospital probably . . . saved his life."

¶21   Treating Physician did not find any indication that Victim was vomiting or had diarrhea. She also noted that Victim had no trouble swallowing, did not exhibit respiratory problems, and was not anorexic. While he was at the Hospital, Victim was placed on a regular diet, and Treating Physician stated that Victim "was very happy" and "constantly asked for food" when he was under her care. After six days in the Hospital, Victim was discharged and had gained nearly three pounds.

¶22   On discharge, Victim returned to Aunt's house after spending some time with Grandfather. After about fifteen months on an unrestricted diet, Victim weighed 103 pounds and had no problems with bowel movements, diarrhea, vomiting, or allergic reactions to food. Aunt and Uncle became Victim's guardians and arranged for him to live at a long-term care facility in Utah County. At the care facility, Victim's weight fluctuated between ninety and 100 pounds. After medical testing ruled out physical causes for his weight fluctuation, the care facility worked with psychiatrists and licensed clinical social workers "to teach [Victim] that it was okay to eat." The care facility helped Victim to develop socialization skills. At the time of trial, Victim weighed 123 pounds.

¶23   Covington was charged with aggravated abuse of a disabled adult pursuant to Utah Code section 76-5-111(2)(a). Wife was also bound over for trial for the same

charge, and the State moved to consolidate the cases. Covington objected, arguing that he would be prejudiced by evidence of Wife's misconduct. The district court granted the State's motion.

¶24 At trial, the jury was presented with evidence recounting the events described above. *See supra* ¶¶ 2–22. The State argued that Covington had caused or permitted Victim's health to be injured by feeding him an inadequate diet. Alternatively, the State argued that Covington had knowingly endangered Victim's health by leaving him with Aunt and Uncle and advising Aunt to maintain the status quo with respect to the diet under which Victim's health had been deteriorating and without sufficient explanation about Victim's recent medical event that required medical attention and possible medical intervention and follow-up.

¶25 Covington defended against the charge by claiming that he could not have known the seriousness of Victim's condition because Victim was shy about being seen without his clothes. Covington also challenged the diagnosis of refeeding syndrome by having his own expert opine that diarrhea or gastrointestinal issues could account for Victim's weight loss and low electrolyte levels. The defense expert testified that he did not believe Victim "had refeeding syndrome" and noted that the medical record from the Hospital contained no indication that Victim suffered from some of the common symptoms of severe malnourishment, like cracks around the mouth, brittle nails, and poor wound healing.

¶26 Covington and Wife were convicted as charged, and the district court suspended Covington's prison sentence, suspended his fine, ordered him to serve sixty days in jail, and placed him on probation for thirty-six months. Covington timely appeals.[3]

---

3. Wife also appealed, but her appeal was dismissed.

ISSUES AND STANDARDS OF REVIEW

¶27 The first issue Covington raises on appeal is whether sufficient evidence was presented at trial to prove that he caused Victim to be injured. The second issue he raises is whether the State presented sufficient evidence to prove that Covington caused or permitted Victim's health to be endangered. "In assessing a claim of insufficiency of the evidence, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645 (quotation simplified). "And we will not reverse a jury verdict if we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (quotation simplified).

¶28 The third issue Covington raises is whether he was prejudiced by the joinder of his trial with Wife's. "We review for an abuse of discretion a trial court's decision to join or sever charges against multiple defendants. The trial court's decision as to joinder or severance will be reversed only if a defendant's right to a fair trial has been impaired." *State v. Nay*, 2017 UT App 3, ¶ 10, 391 P.3d 367 (quotation simplified).[4]

---

4. Citing the Utah Code, Covington further claims that the "State of Utah does not have subject matter jurisdiction" in this matter because "the evidence does not establish that any conduct or any result that is an element of the offense charged was undertaken, occurred, or resulted within" Utah. *See* Utah Code Ann. § 76-1-201(1) (LexisNexis 2017) (providing that a person may be prosecuted for a crime in Utah if "the offense is committed either wholly or partly within the state"). This assertion is based on Covington's argument that the State did not offer sufficient evidence to establish that the manner in which Covington fed Victim while the family was in Utah was potentially injurious to Victim's health or tied to conduct occurring in the State of Utah.

(continued…)

ANALYSIS

I. The Evidence is Sufficient.

¶29   Covington was charged with second-degree aggravated abuse of a vulnerable adult. *See* Utah Code Ann. § 76-5-111(2), (2)(a) (LexisNexis Supp. 2019) (stating that a caretaker who, "[u]nder any circumstances likely to produce death or serious physical injury," "intentionally or knowingly" (1) "causes a vulnerable adult to suffer serious physical injury" or (2) either "causes or permits that adult's person or health to be injured" or "causes or permits a vulnerable adult to be placed in a situation where the adult's person or health is endangered[] is guilty of the offense of aggravated abuse of a vulnerable adult" in the second degree). Reflecting this statutory language, the jury instructions stated that the jury could convict Covington if it found, "unanimously and beyond a reasonable doubt" all the following elements in either of these two sets of elements:

> (a)   1. That on or about February 2014 in Washington County, State of Utah, the defendant, Travis A. Covington, as a caretaker;

---

(…continued)
Because we conclude that there was sufficient evidence presented at trial that the restrictive diet Covington and Wife imposed on Victim injured him, and because the record indicates that Covington imposed that diet on Victim while the family was in Utah for the funeral, we conclude that sufficient evidence was presented at trial to demonstrate by a preponderance of the evidence that the charged conduct took place in Utah. *See State v. Mills*, 2012 UT App 367, ¶ 32, 293 P.3d 1129 (providing that the question of subject matter jurisdiction over an offense is one for the court, not the jury, and must be established by a preponderance of the evidence).

2. Under circumstances likely to produce death or serious physical injury; did
3. Cause a disabled adult to suffer serious physical injury; AND
4. That the defendant did so intentionally or knowingly.

OR

(b)    1. That on or about February 2014 in Washington County, State of Utah, the defendant, Travis A. Covington, having the care or custody of a disabled adult:
2. Under any circumstances likely to produce death or serious physical injury; did
3. Cause or permit that disabled adult's person or health to be injured; OR Cause or permit that disabled adult to be placed in [a] situation where the disabled adult's person or health was endangered; AND
4. That the defendant did so intentionally or knowingly.

¶30    Thus, because part (a) of the instruction has one causation scenario and part (b) of the instruction has two causation scenarios, the jury could have found Covington guilty of second-degree aggravated abuse of a vulnerable adult in any of three circumstances: (1) for intentionally or knowingly causing Victim to suffer serious physical injury under circumstances likely to produce death or serious physical injury, (2) for intentionally or knowingly causing or permitting Victim's person or health to be injured under any circumstances likely to produce death or serious physical injury, or (3) for intentionally or knowingly causing or permitting Victim to be placed in a situation where his person or health was endangered under any circumstances likely to produce death or serious physical injury. Our supreme court "has stated that a jury must be unanimous on all elements

of a criminal charge for [a] conviction to stand." *State v. Hummel*, 2017 UT 19, ¶ 32, 393 P.3d 314 (quotation simplified). And when the State's case is premised on more than one factual or legal theory of the elements of the crime, we require sufficient evidence be presented on each of the alternative elements. *See State v. Johnson*, 821 P.2d 1150, 1159 (Utah 1991) (requiring reversal "if the State's case was premised on more than one factual or legal theory of the elements of the crime and any one of those theories is flawed or lacks the requisite evidentiary foundation"). Thus, to sustain Covington's conviction on appeal, it is necessary for us to address each of the alternative sets of elements identified in the statute and in the jury instruction to determine whether sufficient evidence was presented at trial to support "the essential elements of [the] charged crime." *See Hummel*, 2017 UT 19, ¶¶ 29–30.

¶31 When reviewing the sufficiency of the evidence, an appellate court accords "high deference to the fact-finder at trial." *State v. Hamilton*, 2003 UT 22, ¶ 38, 70 P.3d 111; *see also State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645 (stating that "[i]n assessing a claim of insufficiency of the evidence," the standard of review is "highly deferential"). In considering sufficiency claims, this court reviews "the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Maestas*, 2012 UT 46, ¶ 302, 299 P.3d 892 (quotation simplified). "The jury, not the appellate court, is the exclusive judge of . . . the weight to be given particular evidence. Simply put, that [a] jury weighed the evidence differently than [a defendant] believes it should have is not enough to persuade us that the evidence . . . was insufficient." *State v. Law*, 2020 UT App 74, ¶ 26, 464 P.3d 1192 (quotation simplified), *petition for cert. filed*, July 6, 2020 (No. 20200509). "And a jury is not obligated to believe the evidence most favorable to the defendant, nor does the existence of contradictory evidence or of conflicting inferences warrant disturbing the jury's verdict on appeal." *State v. Granados*, 2019 UT App 158, ¶ 28, 451 P.3d 289 (quotation simplified). "Thus, we will reverse a jury verdict only when the evidence," viewed in the light most favorable to the jury's verdict, "is sufficiently

inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Maestas*, 2012 UT 46, ¶ 302 (quotation simplified).

¶32 Our sufficiency analysis follows the structure adopted by the parties in this case. Thus, we first consider whether sufficient evidence was presented at trial to prove Covington intentionally or knowingly caused or permitted Victim to be injured (causing Victim to suffer serious physical injury or causing or permitting Victim's person or health to be injured), and then we consider whether sufficient evidence was presented at trial to prove Covington intentionally or knowingly placed Victim in a situation where his health was endangered (causing or permitting Victim to be placed in a situation where his person or health was endangered).

A.    Covington Caused or Permitted Injury to Victim.

¶33 Covington challenges the sufficiency of the evidence supporting the jury's finding that he intentionally or knowingly caused or permitted injury to Victim's health. Specifically, Covington argues that there was insufficient evidence presented by the State at trial to prove beyond a reasonable doubt (1) he intentionally or knowingly denied Victim nourishment and fluids or (2) he at least knew that the diet formulated by Wife did not provide Victim adequate nutrition. Instead, Covington advances the theory that "gastrointestinal problems had been a factor that had substantially contributed to [Victim's] malnutrition and dehydration" and "was the only hypothesis that was supported by the evidence." We disagree.

¶34 Ample evidence supported the finding that Covington knowingly caused or permitted Victim to be injured by restricting his food intake and failing to seek medical care. *See* Utah Code Ann. § 76-2-103(2) (LexisNexis 2017) ("A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."). Covington had been feeding Victim the

restrictive diet for ten years. During that time, several family members told Covington that Victim was too thin and needed to be fed more, but Covington did not heed their advice and even went so far as to put a lock on Victim's door to keep him from eating when he craved food. Victim then collapsed in Quartzite and required emergency medical care at LaPaz, and at that point, Covington was told to increase Victim's fluid and food intake. Yet even after LaPaz, Covington continued to keep Victim on the same diet. At LaPaz, Victim weighed eighty pounds, and by the time he reached the urgent care facility in Hurricane—after having continued the restrictive diet—Victim weighed fifty-five pounds, having lost thirty-one percent of his body weight in four weeks. As the State points out, "This evidence establishes an observable cause and effect between Victim's post-LaPaz rapid weight loss and the diet on which Covington kept him." This conclusion is further buttressed by the fact that after Victim was freed of the dietary restrictions Covington imposed on him, he began to rapidly gain weight and suffered no apparent allergic reactions to consuming an unrestricted diet of nutritional food. Indeed, once Victim learned that it was "okay to eat," his weight increased to 123 pounds.

¶35    The evidence also supports the conclusion that Covington injured Victim in more serious ways besides causing him to lose weight. Treating Physician testified at length that Victim was in danger of death due to malnutrition, dehydration, refeeding syndrome, imbalanced electrolytes, liver malfunction, and organ failure.

¶36    With regard to perhaps the most serious immediate threat to his health that Victim faced, Covington argues on appeal that "[t]he State presented no evidence that [Victim] ever exhibited any metabolic disturbance associated with refeeding and the theory that he was at risk of developing such symptoms was based upon assumptions rather than evidence." This assertion lacks merit because it runs contrary to the evidence presented at trial. In fact, the State presented abundant evidence, through the testimony of Treating Physician, that Victim had refeeding syndrome as indicated by several markers for the phenomenon,

most notably imbalanced electrolyte levels. In response, Covington argues that it is significant that Victim never exhibited "the onset of any of the metabolic disturbances that are associated with refeeding syndrome," even though he had been "eating voraciously" preceding his admission to the Hospital. From this evidence, Covington asserts that "[t]he conclusion that [Victim] was actually at risk of developing dangerous metabolic disturbances [from refeeding] was based upon assumption, not evidence." But Treating Physician explained that difficulties with refeeding do not usually manifest themselves until three or four days after the reintroduction of food. And within two days after Aunt began providing Victim with additional food, Victim was taken to the Hospital and remained under direct medical care as food was reintroduced. Thus, the fact that Victim did not face serious difficulties with refeeding is as much attributable to the successful treatment he received at the Hospital as it is a sign that he did not have the syndrome.

¶37   Furthermore, the evidence supported the jury's conclusion that Covington was aware that his conduct was reasonably certain to result in injury to Victim's health. There is no question that Victim was severely emaciated—which the jury saw by means of photographic evidence. Indeed, Victim's condition was so apparently alarming when he arrived at Aunt and Uncle's house that all the adults involved agreed that Victim needed immediate medical attention. Once Victim arrived at the urgent care facility in Hurricane, it became apparent that he needed a higher level of care available at a larger medical center, so Victim was transferred to the Hospital in St. George. Based on this evidence, the jury could reasonably find Covington's claim of ignorance lacked credibility and that he was aware that Victim was seriously ill and that his conduct was reasonably certain to result in injury to Victim's health.

¶38   Even if Covington had been able to produce credible evidence that Victim had gastrointestinal issues, it would not have been dispositive. "The existence of one or more alternate reasonable hypotheses does not necessarily prevent the jury from concluding that [a] defendant is guilty beyond a reasonable

doubt." *State v. Blubaugh*, 904 P.2d 688, 695 (Utah Ct. App. 1995). "The fact that we can identify an equally plausible alternative inference is not nearly enough to set a verdict aside. On appeal, the question presented is not whether some other (innocent) inference might have been reasonable, but simply whether the inference adopted by the jury was sustainable." *State v. Wall*, 2020 UT App 36, ¶ 54, 460 P.3d 1058 (quotation simplified); *accord State v. Ashcraft*, 2015 UT 5, ¶ 25, 349 P.3d 664. Provided "that there is sufficient competent evidence as to each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime," it is "within the province of the jury to judge the credibility of the testimony, assign weight to the evidence, and reject these alternate hypotheses." *State v. Lyman*, 966 P.2d 278, 281–82 (Utah Ct. App. 1998) (quotation simplified). Thus, Covington's presentation of an alternative theory does not establish an insufficiency of evidence supporting his conviction under the State's theory that Covington's imposition of the restrictive diet and subsequent failure to seek medical care harmed Victim's health.

¶39 In conclusion, the State presented abundant evidence that Covington determined what Victim was allowed to eat, limited how much he was allowed to eat, and failed to seek medical care for Victim when he was aware that Victim was gravely ill. From this evidence, the jury could easily conclude beyond a reasonable doubt that Covington intentionally or knowingly caused Victim's injuries.

B. Covington Placed Victim in an Injurious Situation.

¶40 Under the third causation alternative, the State presented sufficient evidence that Covington intentionally or knowingly placed Victim in a situation that endangered his health when he left Victim with Aunt and Uncle without alerting them to his fragile medical condition or explaining the details of Victim's recent need for medical intervention. The record shows that Aunt and Uncle, unaware of the risk posed by refeeding syndrome, began to feed Victim as much food as he wanted right after Covington had left Victim with the family. As

Treating Physician testified, *see supra* ¶ 20, if Aunt and Uncle had continued to restrict the amount and type of food fed to Victim as Covington instructed, Victim would have likely continued to suffer from extreme malnutrition and face the possibility of organ failure in a short time. On the other hand, by feeding him an unrestricted diet of normal amounts of food, Victim ran the risk of "sudden death" through refeeding syndrome. In either case, by entrusting Victim's care to Aunt and Uncle—people without medical training and without sufficient explanation of Victim's medical history—Covington intentionally or knowingly endangered Victim's health.

¶41 Covington argues on appeal that the State was required to prove that he knew about the specific risks associated with refeeding syndrome. But the vulnerable adult abuse statute does not require Covington to have precise knowledge of the physiological consequences of his actions. Rather, it states that second-degree aggravated abuse of a vulnerable adult occurs when a person intentionally or knowingly "causes or permits a vulnerable adult to be placed in a situation where the adult's person or health is endangered." Utah Code Ann. § 76-5-111(2), (2)(a) (LexisNexis Supp. 2019). And "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 76-2-103(2) (2017). Thus, Covington did not need to know about the precise medical means by which Victim might suffer harm—be it malnutrition, organ failure, or refeeding syndrome—but only that by entrusting his medically fragile son to the care of Aunt and Uncle without informing them of Victim's recent weight loss, hospitalization, and health issues, he was aware that he was endangering Victim's health.

¶42 Based on the evidence, the jury could reasonably conclude that Covington knew that Victim was in a critically fragile medical state. Victim's condition was obvious to Aunt, Uncle, Cousin, and Leader. And Covington was aware that Victim had recently collapsed in Quartzite due to hypoglycemia. He was told on discharge from LaPaz to increase Victim's food and fluid intake. He had witnessed Victim's weight drop

precipitously after the LaPaz incident. He testified that he had noticed Victim had lost "quite a bit of weight," a development he described as "really alarming and concerning, and . . . one of the reasons why [he] started calling [his] sisters" to discuss Victim's situation. Even if Covington was not aware of the intricacies of refeeding syndrome, he knew that Victim was alarmingly and disconcertingly emaciated. Instead of seeking medical care for Victim, Covington chose to drop off Victim at Aunt and Uncle's house and recommend that they continue the restrictive diet that had led to Victim's deterioration. Covington remained silent in relating details of Victim's condition to Aunt and Uncle such that they might be aware of an impending need to seek medical intervention.

¶43    From this evidence, a jury could find beyond a reasonable doubt that Covington knew that leaving Victim with Aunt and Uncle in his fragile condition—recommending a continuation of the status quo and without disclosing his recent decline—placed Victim in a dangerous situation.

## II. Covington Was Not Prejudiced by Joinder.

¶44    Lastly, Covington argues that he was prejudiced by the joinder of his trial with that of Wife.[5] Specifically, Covington

---

5. Covington also raises a one-sentence constitutional argument in this context: "Defendant contends that in a joint trial of spouses the introduction [of] evidence of the alleged misconduct of one spouse to the prejudice of the other creates an impermissible conflict between one's right to appear and defend and his right to not facilitate the conviction of his own spouse." An issue is inadequately briefed if it provides "no meaningful legal analysis" and instead relies on "only one or two sentences" generally stating an argument and "broadly" concluding that an appellant is "entitled to relief." *State v. Green*, 2005 UT 9, ¶ 11, 108 P.3d 710 (quotation simplified). We determine that this issue is inadequately briefed and decline to consider Covington's argument on this point.

argues that "the State launched an attack that was calculated to make monsters of both [Covington and Wife] by introducing testimony suggesting that [Victim] had been singled out and treated differently than were the other Covington children . . . [and] eliciting testimony concerning [Wife's] alleged callousness."

¶45 "The trial court's decision as to joinder or severance will be reversed only if a defendant's right to a fair trial has been impaired." *State v. Nay*, 2017 UT App 3, ¶ 10, 391 P.3d 367 (quotation simplified). And "any error in denying severance will be deemed harmless unless [the] defendant can establish a reasonable likelihood of a more favorable outcome if the court had granted a severance." *State v. Calliham*, 2002 UT 86, ¶ 34, 55 P.3d 573 (quotation simplified). Prejudice may arise in a joinder context when evidence admissible against one defendant—but inadmissible against the other if the proceedings were separate—is admitted. *See State v. Velarde*, 734 P.2d 440, 445 (Utah 1986) (conducting a prejudice analysis by considering "evidence that might have been different or unavailable at a separate trial").

¶46 Covington's claim fails because he cannot show prejudice resulting from the joinder. He broadly asserts that evidence of Wife's treatment of Victim "was used to tar both defendants with the same brush," but he makes no effort to explain how he was tarnished by evidence of Wife's mistreatment of Victim. The State presented evidence that Wife engaged in verbally abusive behavior toward Victim, but it did not attempt to blur the distinction between Covington and Wife in so doing. Indeed, the record contains only one instance where the State mentioned that "[Covington] and [Wife] would call [Victim] names."

¶47 Furthermore, the most harmful evidence presented regarding Covington's treatment of Victim did not relate to any verbal abuse but to the physical harm of imposing an inadequate diet on Victim and failing to seek appropriate medical care when it was obvious that Victim's health was rapidly deteriorating.

We fail to see how Covington was prejudiced by the joinder of the trials given the abundant evidence that Covington directly endangered Victim's health and placed him in an injurious situation.

CONCLUSION

¶48     We conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Covington intentionally or knowingly caused or permitted Victim to be harmed and that Covington intentionally or knowingly placed Victim in a situation where his health would be endangered. We further conclude that Covington was not prejudiced by the joinder of his trial with that of Wife.

¶49     Affirmed.

───────────