**2025 UT App 86**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ISAAC MICHEAL CHRISTENSEN,
Appellant.

Opinion
No. 20230033-CA
Filed June 5, 2025

Seventh District Court, Price Department
The Honorable Jeremiah Humes
No. 211700443

Freyja Johnson, Rachel Phillips Ainscough, and
Heather Ellison, Attorneys for Appellant

Derek E. Brown and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

OLIVER, Judge:

¶1      One evening in July 2021, Isaac Micheal Christensen's daughter, Nadine, called Christensen's ex-girlfriend, Kim, for help because Christensen was drunk and acting erratically. Kim and her current boyfriend, Rick, drove to Christensen's house to help Nadine without notifying Christensen.[1] When they arrived at Christensen's house, Nadine disclosed to Kim that Christensen had sexually abused her earlier that evening. Kim went outside with Nadine and called 911. Shortly after, Christensen exited the house and threatened Kim, Rick, and several police officers responding to the 911 call, all while pointing a shotgun at them.

---

1. Nadine, Kim, and Rick are pseudonyms.

Christensen was arrested and charged with ten felonies and three misdemeanors for his conduct that night. Christensen moved to sever the charges related to the sexual abuse allegations made by Nadine from the charges related to Christensen's conduct with the shotgun, but the district court denied the motion.

¶2 At his trial on all the charges, Christensen objected to the admission of body camera footage of a police officer interviewing Nadine on the night of the 911 call, arguing it contained hearsay. The district court deemed Nadine's statements during the interview prior consistent statements under rule 801(d)(1)(B) of the Utah Rules of Evidence and allowed them to be presented to the jury at trial. The jury convicted Christensen on all the charges. Christensen now appeals, asserting that the district court abused its discretion in denying his motion to sever and in admitting the body camera footage of Nadine's interview. We reject Christensen's arguments and affirm his convictions.

## BACKGROUND[2]

### *The Incident and Allegations*

¶3 One day in July 2021, Kim received several troubling and nonsensical text messages from Christensen. Kim and Christensen had previously been in a romantic relationship, and Kim had lived with Christensen for a few months earlier in the year. However, Kim and Christensen had broken up several weeks before she received the texts from him, and Kim had gotten back together with her previous boyfriend, Rick. After receiving the texts, Kim reached out to Christensen via video call to ask if

---

3. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Rogers*, 2020 UT App 78, n.2, 467 P.3d 880 (cleaned up).

he was okay because his behavior was unusual. Christensen's phone image started moving as if he was hitting his head with his phone, and then the call cut out.

¶4    Later that evening, Christensen's eleven-year-old daughter, Nadine, called Kim to ask for help because Christensen was drunk and acting erratically. After Kim received Nadine's call, Kim, Rick, and their baby drove from their house in Midvale, Utah to Christensen's house in Helper, Utah without notifying Christensen. During the two-hour drive, Kim spoke with Nadine on the phone a few times. Kim arrived at Christensen's house around midnight and went inside while Rick and the baby remained outside. When Kim entered the house, Christensen demanded to know who was in his house and retrieved a shotgun from his bedroom, pointing it at Kim's chest despite Nadine's informing him, "It's just [Kim]. It's just [Kim]."

¶5    After recognizing Kim, Christensen lowered the shotgun. Nadine then spoke with Kim privately and told her that earlier that evening, Christensen had touched her vagina and "made [her] suck his penis," and "would slap [her] if [she] didn't do it properly." Kim then asked Christensen if Nadine could go outside with her, but Christensen did not want Nadine to leave the house. After making several comments about his ability to kill people, Christensen relented and allowed Nadine to go outside with Kim. Once outside, Kim immediately called 911.

¶6    While Kim was on the phone with 911, Christensen came to the doorway unarmed and told Nadine it was time to come inside and go to bed. As Kim stalled for time, Christensen went into his house and then returned outside with a shotgun. Christensen pointed the shotgun at Kim and accused her of playing "games" with him and "whispering on the phone." Kim told Christensen she was on the phone with her grandmother, who lived on the same street. Christensen pointed the shotgun at Rick, asked him why he was staring at him like a "pedophile,"

and told Rick that he would "put a slug in his head" if he did not shut up. After Rick heard Christensen rack his shotgun, he went to the back seat of the car to protect his baby.

¶7     At the same time, four officers responding to the 911 call (Officers 1, 2, 3, and 4) arrived without lights or sirens and parked down the street. The officers approached on foot with flashlights and without identifying themselves. While the officers were approaching, Christensen shattered the rear window of Kim's car with the barrel of the shotgun and stated, "[I]f that's the Carbon County sheriffs, I'll put a bullet in them too." Believing the noise from the glass shattering was a gunshot, the officers ran toward the house. As they approached, Christensen positioned the shotgun (that had a red dot sight) on top of the car and pointed it at the officers. The officers retreated, and Christensen threw the shotgun into his front yard and then went back into his house.

¶8     At this point, Kim and Rick were able to get into their car and drive to Kim's grandmother's house down the road. Once out of the driveway, they told Officer 3 that Nadine was still at the house. Officer 1 and Officer 2 returned to their vehicles to get rifles, while the other two officers stayed near Christensen's house. As Officer 1 and Officer 2 approached the house, Nadine came out from the side of the house. Officer 3 and Officer 4 walked Nadine back toward their vehicles; Officer 4 placed her in one of the vehicles so she would be out of harm's way.

¶9     Christensen then exited the house unarmed with his hands up and was arrested by the officers without incident. Officer 4 then went to Kim's grandmother's house—where Kim, Rick, and Kim's grandparents were—to interview Nadine. Before the interview, Nadine had been alone in the kitchen with Kim. During the interview, for which Kim was also present, Nadine disclosed that Christensen hit her, but she was reluctant to talk about the sexual abuse until Kim told Officer 4 that Christensen had made Nadine "suck him." Nadine then told Officer 4 that Christensen

would threaten her when she was not "do[ing] it properly." Officer 4's body camera recorded his interview with Nadine (the Interview Footage).

¶10 Nadine was treated by an emergency medical technician (EMT) at the scene and disclosed to EMT that Christensen had "touched her 'down there'" and that he had slapped her multiple times in the face when she "didn't do things the right way" but that the slaps were not hard.

¶11 After Christensen was arrested, an officer at the jail collected a penile swab from Christensen, which was the first penile swab the officer had taken. This officer had been trained in taking buccal swabs[3] but not penile swabs.

*The Investigation*

¶12 The next morning, Nadine was examined by a nurse (Nurse) who was not a certified sexual assault nurse examiner but had completed similar training. During the examination, Nurse completed a sexual assault form, which is "an 11-page document" that details "what sort of contact occurred and what injuries [were observed] and any history." Nurse observed that Nadine had no apparent injuries. However, Nadine reported that Christensen forced her "to put his penis in her mouth" and that Christensen had "put his hands in her vagina." Nurse also collected several swabs from Nadine to check for sexually transmitted infections and to check for the presence of DNA that did not match Nadine's. Nurse also took photos of Nadine and collected the clothing Nadine was wearing when she arrived.

---

3. "A buccal swab is a routine method for obtaining a DNA sample that involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells." *State v. Evans*, 2021 UT 63, ¶ 1 n.1, 500 P.3d 811 (cleaned up).

¶13 Nadine was later interviewed at the Children's Justice Center (CJC). While in the lobby waiting for the interview to begin, Nadine met and spoke with a Carbon County Sheriff's Office detective (Detective) who was also waiting in the lobby. This conversation was not recorded. Once the interview began, the CJC interviewer (Interviewer) could not establish a good rapport with Nadine. So, Interviewer left the interview and Detective stepped in to continue Nadine's interview. Nadine disclosed the sexual abuse to Detective during the interview, telling him that Christensen made her suck him "down here," referring to Christensen's genitals, and forced her to let him "lick down here," referring to her own genitals. She also stated that Christensen hit her "[h]ard across the cheek" and in the middle of her back.

¶14 For a number of months after the interview, Nadine would frequently meet with Detective; they would discuss how Nadine was doing, topics she was interested in, and whether she had any concerns or questions about the court process. The post-interview meetings were not recorded.

*The Charges and Motion to Sever*

¶15 Christensen was charged with three counts related to the alleged abuse of Nadine: sodomy upon a child, aggravated sexual abuse of a child, and child abuse (collectively, the sexual abuse charges). He was also charged with four counts of assault against a peace officer, two counts of aggravated assault (one with a domestic violence enhancement), two counts of commission of domestic violence in the presence of a child, and one count of criminal mischief (collectively, the assault charges). Christensen moved to sever the sexual abuse charges from the assault charges, arguing that the sexual abuse charges were not connected to the assault charges and that he would be prejudiced by their joinder. The State opposed Christensen's motion to sever.

¶16    The district court denied Christensen's motion to sever in an oral ruling. In denying the motion, the court found that the evidence of the sexual abuse charges and the assault charges was "inextricably intertwined." The court relied on the fact that the alleged crimes were "very closely connected in time, no more than two hours" apart, and that they were "part of a similar pattern of conduct" because the State sought to prove Christensen "was acting aggressively toward the child, then toward the adults, then toward the police." The district court also found that Christensen would not be unduly prejudiced from a single trial on all the charges because evidence of both groups of charges was needed to support the State's theory of the case (that Christensen's conduct with the shotgun occurred because of his guilty state of mind after committing the alleged abuse) and Christensen could present his theory of the case just as well (that the sexual assault did not occur and the reason "he responded the way he did is because someone entered his house unlawfully").

¶17    The district court determined that rule 404(b) of the Utah Rules of Evidence—which prohibits the use of prior bad acts "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character"—did not apply. And the court also ruled that, even if rule 404(b) did apply, the rule would not restrict evidence of either set of charges from coming in because there would be "a proper noncharacter purpose in either of the separate trials." Finally, the court ruled that the probative value of the evidence would not be substantially outweighed by a danger of unfair prejudice and, thus, that its admission did not violate rule 403 of the Utah Rules of Evidence. *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

*The Trial*

¶18 The case proceeded to a jury trial where the State presented evidence from seventeen witnesses, including Nadine, Kim, Rick, Officers 1, 2, 3, and 4, the emergency dispatcher, three forensic scientists, EMT, Nurse, Detective, and Interviewer. During Nadine's testimony, the State played a video of her CJC interview. After the video was played, Nadine testified that the statements she made in the CJC interview were true. She also acknowledged that Detective was one of her close friends now and that she was "pretty good friends" with Kim.

¶19 Kim testified about her phone call with Christensen, her phone calls with Nadine, and the events that occurred at Christensen's house as described above. She also testified that, during the phone calls that took place during her two-hour drive to Helper, Nadine did not mention that Christensen sexually abused her. And Rick testified as to the events as detailed above.

¶20 The emergency dispatcher who received Kim's 911 call testified. She testified that she heard through the phone Christensen saying "he would fire the weapon" and "put a slug in [Kim's] head." The recording of the 911 call was also played for the jury.

¶21 Officers 1, 2, 3, and 4 all testified about the events detailed above. Officer 1 further testified that he did not activate his body camera, so he had no body camera footage that could be played for the jury. Footage from Officer 1's vehicle dash camera and a video of Christensen sitting in Officer 1's patrol vehicle were admitted at trial. Officer 1 also testified about interviewing Christensen at the jail. He stated that during the interview, he told Christensen he was arrested for pointing "a gun at officers" and that Christensen stated he did not remember doing that. Officer 1 acknowledged that he did not do any tests to determine if Christensen was intoxicated and that Christensen seemed confused.

¶22 The State also sought to play the Interview Footage from Officer 4's interview with Nadine at Kim's grandmother's house, but the district court sustained Christensen's objection to admission of that evidence at that time. The court was concerned it was being offered "as a prior consistent statement by the victim, and [she had] not been impeached yet."

¶23 EMT and Nurse testified about their interactions with Nadine as described above.

¶24 The State called three forensic scientists to testify. They testified that Christensen's penile swab was positive for human alpha-amylase, which is a digestive enzyme found in saliva, tears, and fecal matter.[4] However, no control swab was taken, and the sample was taken with a foam swab instead of a cotton swab, which is the preferred type of swab. The DNA analysis of Christensen's penile swab provided a mixture of DNA from two individuals, one matching Christensen and one matching Nadine. An analysis of Nadine's swabs found no male DNA.

¶25 The State also called Detective, Interviewer, an officer who took photos of the scene, and the officer who took Christensen's penile swab. All testified about their involvement in the case as described above.

¶26 Christensen called three witnesses in his defense. He first called a forensic psychologist (Psychologist). Psychologist testified about the irregularities in Nadine's CJC interview, including the change in interviewer, which he had never seen happen before. He opined that the change in interviewer could have signaled to Nadine that she was not giving the right answers to the first interviewer. He also testified that it was "highly

---

4. According to one of the forensic scientists, while laboratory testing can "determine the presence of bodily fluids," such as human alpha-amylase, it cannot "determine why it's present or from whom it's present."

concerning" that Nadine had an unrecorded forty-minute conversation with Detective before the CJC interview and hours of unrecorded conversations with Detective after the interview.

¶27 Psychologist also testified about proper interview techniques and forensic interview technique (FIT) interviewing of children. He explained that FIT interviewing is an evidence-gathering protocol developed over forty years by psychologists and law enforcement for interviews of children. Psychologist opined that a proper FIT interview requires the interviewer to be totally and completely objective and approach the interview with a neutral position.

¶28 Christensen also called a nurse practitioner who reviewed Nadine's sexual assault examination report. The nurse practitioner testified that there was no redness on Nadine's face to support her claims that Christensen slapped her. She also noted that when Christensen was arrested, his underwear was "soiled" and it was possible that this led to the presence of amylase on his penile swab.

¶29 Finally, Christensen called a private investigator (Investigator) who testified about the proper interview guidelines for CJC interviews. He also reviewed the officers' body camera footage and noted that no footage showed Christensen holding a weapon. Finally, Investigator testified that it was basic police protocol for officers to separate witnesses before interviewing them, "to find out what each individual witness knew or had to say or had knowledge of," but that Officer 4 had not done so when he allowed Kim to be present for the interview with Nadine. Investigator emphasized that when any of the witnesses are children it is even more important to separate them and interview them individually.

¶30 After Christensen rested, the State again sought to admit the Interview Footage, which the court had previously refused to admit. The State argued the Interview Footage should now be

admitted as a prior consistent statement because the defense had implied that Nadine had fabricated her account or, at a minimum, that she had "acted from a recent improper influence" on her testimony. Christensen argued that the video was still hearsay because there was not "sufficient evidence of impeachment" or "a direct attack on [Nadine's] statement" to warrant admission of the Interview Footage as a prior consistent statement. The court admitted the Interview Footage, ruling that Psychologist's testimony about the problems with the CJC interview was "an implied charge" that Nadine "was acting under improper influence or motive," and that, therefore, the video "qualifie[d] as a prior consistent statement to rebut" the charge. The State then played the Interview Footage for the jury.

¶31 Before deliberations, the jury was instructed on three affirmative defenses: intoxication, defense of self or others, and defense of habitation. After deliberating, the jury convicted Christensen on all twelve counts. Christensen timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶32 Christensen raises two issues on appeal. First he argues the district court abused its discretion in denying his motion to sever the sexual abuse charges from the assault charges. "The grant or denial of severance is a matter within the discretion of the trial judge, so we reverse a denial only if the trial judge's refusal to sever charges is a clear abuse of discretion in that it sacrifices the defendant's right to a fundamentally fair trial." *State v. Lim*, 2022 UT App 69, ¶ 16, 513 P.3d 72 (cleaned up).

¶33 Christensen also contends that the district court abused its discretion in admitting the Interview Footage. "We grant significant deference to a lower court's determination to allow or exclude evidence and review its decision for abuse of discretion." *State v. Estes*, 2025 UT App 10, ¶ 15, 564 P.3d 239, *cert. denied*, Mar. 20, 2025 (No. 20250166).

ANALYSIS

I. Denial of the Motion to Sever

¶34    Christensen argues the district court abused its discretion in denying his motion to sever the sexual abuse charges from the assault charges. However, "severance is not a matter of right." *State v. Jaimez*, 817 P.2d 822, 825 (Utah Ct. App. 1991). "Two or more felonies . . . may be charged in the same indictment or information if" the offenses are either "(a) based on the same conduct or are otherwise connected together in their commission; or (b) alleged to have been part of a common scheme or plan," and neither party will be "prejudiced by [the] joinder." Utah Code § 77-8a-1(1), (4). And "any error in denying severance will be deemed harmless unless the defendant can establish a reasonable likelihood of a more favorable outcome if the court had granted a severance." *See State v. Covington*, 2020 UT App 110, ¶ 45, 472 P.3d 966 (cleaned up). Here, even if we assume—without deciding— that the district court abused its discretion in denying Christensen's motion to sever, we conclude that Christensen has not demonstrated "a reasonable likelihood of a more favorable outcome" on either set of charges if they had been tried in two separate trials. *Id.* (cleaned up).

A.    The Sexual Abuse Charges

¶35    In a hypothetical separate trial on the sexual abuse charges, the jury would not hear any evidence regarding the assault charges. But even without that evidence, the jury would be presented with strong testimonial and physical evidence against Christensen supporting the sexual abuse charges.

¶36    Regarding the testimonial evidence, the jury would still have heard about the events leading up to Kim's arrival at Christensen's house, including the nonsensical text messages Kim received from Christensen and the video call Kim had with Christensen earlier that day where he was exhibiting strange

behavior. The jury also would have heard from Kim and Nadine about how Nadine called Kim for help because Christensen was drunk and acting erratically and how Kim found the behavior so troubling that she put her baby into her car and drove two hours from Midvale to Helper to check on Nadine and Christensen. The jury would also have heard that when Kim arrived at Christensen's house, Nadine asked to speak with her privately and disclosed that, earlier that same evening, Christensen had touched her vagina and "made [her] suck his penis" and "would slap [her] if [she] didn't do it properly."

¶37   Assuming that no mention of Christensen's conduct with the shotgun would have come in, the jury still would have been informed that Kim called 911 after Nadine's disclosure and that Officer 4 interviewed Nadine at Kim's grandmother's house, where Nadine confirmed Kim's statement that Christensen made "her suck him" and disclosed that he threatened her when she was not "do[ing] it properly." Finally, the jury would have heard testimony from Nadine about the sexual abuse, including the recording of her CJC interview describing the abuse, and heard testimony from both EMT and Nurse about Nadine's disclosures to them within twenty-four hours of the abuse.

¶38   In terms of physical evidence, the jury would have heard that human alpha-amylase—a substance found in saliva, tears, and fecal matter—was found on Christensen's penile swab. And, perhaps most significantly, the jury also would have heard that the results of the DNA analysis of Christensen's penile swab showed DNA matching two profiles: Nadine and Christensen.

¶39   On the defense side, all of Christensen's attacks on Nadine's testimony and her credibility, as well as the influences or motive to fabricate, would have been presented to the jury in much the same way as they had been in the actual trial. And the jury would have heard Christensen's alternative explanations of

why there was human alpha-amylase and Nadine's DNA on his penile swab.

¶40    Nonetheless, Christensen contends that a jury in a separate trial would be less likely to convict him of the sexual abuse charges because the assault charges portraying him as "a lawless, violent man" are what made the difference for the jury in reaching its guilty verdict. But it is unlikely that evidence of his conduct toward Kim, Rick, and the officers tipped the scales towards conviction on the sexual assault charges. Indeed, the State presented compelling evidence in support of the sexual assault charges—in particular, Nadine's testimony combined with the DNA evidence showing that Nadine's DNA was present on Christensen's penis. Thus, we see no reasonable likelihood that a jury would acquit Christensen of the sexual abuse charges in a trial without any reference to his actions with the shotgun.

¶41    Therefore, even if the charges were tried separately, Christensen has not demonstrated "a reasonable likelihood of a more favorable outcome" in a separate trial on the sexual abuse charges. *State v. Covington*, 2020 UT App 110, ¶ 45, 472 P.3d 966 (cleaned up).

B.    The Assault Charges

¶42    In a hypothetical separate trial on the assault charges, there would be strong evidence for the jury to convict Christensen even if the details of the sexual abuse allegations were not disclosed to the jury. As in the original trial, the jury would have heard about the events leading up to Kim's arrival at Christensen's house, including the nonsensical text messages Kim received from Christensen and the video call Kim had with Christensen earlier that day where he was exhibiting strange behavior. The jury also would have heard from Kim and Nadine about how Nadine called Kim for help because Christensen was drunk and acting erratically and how Kim decided to immediately drive from Midvale to Helper to check on Nadine and Christensen. The jury

would have heard that when Kim entered Christensen's house, he demanded to know who was in his house and retrieved a shotgun from his bedroom that he pointed at Kim's chest, despite Nadine's informing him, "It's just [Kim]. It's just [Kim]."

¶43 Additionally, as appellate counsel conceded during oral argument, the jury likely would have heard at least something about a sexual abuse allegation made by Nadine to Kim. For instance, the fact that Nadine made allegations of sexual abuse would likely have been admissible to explain why Kim called 911. The fact that Nadine made allegations of sexual abuse may also have been admissible to explain a motive for Christensen's actions taken against Kim, Rick, and the officers.

¶44 But regardless of whether the allegations of sexual assault were admissible, the jury would have heard strong evidence in support of the assault charges. In addition to hearing the recording of Kim's frantic 911 call—during which Christensen can be heard threatening Kim—the jury would have heard testimony from Kim and Rick describing Christensen pointing the shotgun at them, threatening them, and breaking their car window, all in the presence of their infant son. The jury also would have heard testimony from the four responding officers about how they heard the window shatter and that when they approached the property Christensen was pointing a firearm in their direction. The officers' testimony would have been corroborated by body camera footage of their approach to the house and vehicle dash camera footage of them scattering when they encountered Christensen with a firearm pointed in their direction. The jury also would have seen the photos of Christensen's shotgun and the broken window of the car.

¶45 In his defense, Christensen would still have been able to attack the officers' credibility through Investigator's testimony that none of the body camera footage showed a firearm. And Christensen would have again been able to request jury

instructions on his affirmative defenses of intoxication, defense of self or others, and defense of habitation.

¶46 Christensen argues that without the sexual abuse charges portraying him "as a bad actor with a propensity to act unlawfully and violently," the jury would have been more likely to accept that he acted to defend his home, himself, and his daughter. We see little chance that this made the difference in the jury's verdict. The State presented strong evidence in support of the assault charges, including testimony from six witnesses that Christensen was pointing the shotgun in their direction or in the direction of others, vehicle dash camera and body camera footage of Christensen's actions, Kim's frantic 911 call that also captured Christensen's threatening comments, and photographs of the shotgun and broken window.

¶47 Thus, even if the jury in a separate trial did not hear anything about the sexual abuse charges, it would have heard convincing evidence of Christensen's guilt on the assault charges. Accordingly, Christensen has not demonstrated "a reasonable likelihood of a more favorable outcome" in a separate trial on the assault charges. *State v. Covington*, 2020 UT App 110, ¶ 45, 472 P.3d 966 (cleaned up).

¶48 In sum, we affirm the district court's denial of Christensen's motion to sever because he has not established "a reasonable likelihood of a more favorable outcome" on either the sexual abuse charges or the assault charges if they were tried separately. *See id.* (cleaned up).

## II. The Interview Footage

¶49 Christensen also argues that the district court abused its discretion when it admitted the Interview Footage because it was hearsay and did not fall under the prior consistent statement exemption in rule 801(d)(1)(B) of the Utah Rules of Evidence. We are unpersuaded and affirm the district court.

¶50 Hearsay is "an out-of-court statement offered to prove the truth of the matter asserted. In other words, hearsay is a statement that the declarant originally made outside of the current trial or hearing and is now being used to prove the truth of what was said." *State v. Green*, 2023 UT 10, ¶ 83, 532 P.3d 930 (cleaned up). However, "some out-of-court statements used for their truth are classified as 'not hearsay' and are excluded from the rule. Others are still considered hearsay but are nonetheless admissible due to the conditions under which they were made." *Id.* (cleaned up). One such circumstance where an out-of-court statement offered for its truth is classified as "not hearsay" is when a statement is introduced that "is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." Utah R. Evid. 801(d)(1)(B). This "prior consistent statement exemption to the hearsay rule" applies only "to premotive, consistent, out-of-court statements." *Green*, 2023 UT 10, ¶ 84 (cleaned up). To be admissible, the statement must have been "made prior to the time a motive to fabricate arose." *Id.*

¶51 Christensen argues that Nadine's statements in the Interview Footage "did *not* predate the primary alleged influence to fabricate—improper police interview techniques"—because the interview itself included these improper police interview techniques that influenced Nadine. In his briefing, Christensen lists several implied charges in the evidence at trial to demonstrate that a motive or influence to fabricate existed when Officer 4 interviewed Nadine. Namely, Christensen asserts that the interview with Officer 4—the one at Kim's grandmother's house—created an influence to fabricate because Officer 4 was not coming from a neutral position as he too was an alleged victim in the case, which did not follow the FIT guidelines for interviewing children. Further, Christensen argues that Kim's presence during the interview with Officer 4 created an influence to fabricate prior to the CJC interview because it violated interviewing protocols for separating witnesses. Grouping together all the implied charges

of fabrication as stemming from "improper interview techniques," Christensen then argues that the district court's ruling admitting the Interview Footage under rule 801(d)(1)(B) was erroneous. He asserts that even though the statements in the Interview Footage predate the CJC interview at which Christensen implied that Nadine fabricated the sexual abuse charges, they do not meet the requirements of the rule because they do not predate Officer 4's alleged improper interview techniques during the Interview Footage.

¶52 The State argues the Interview Footage was properly admitted under rule 801(d)(1)(B) because one of the implied charges of fabrication expressly recognized by the district court was that Nadine fabricated her story after the change in interviewers during the CJC interview because of her prior relationship with Detective and her desire to appease him. The State further argues that because Nadine met Detective for the first time the day of the CJC interview, this motive to fabricate could not have existed before Nadine's interview with Officer 4, which occurred shortly after Kim called the police. The State also emphasizes that, to be admissible under rule 801(d)(1)(B), a prior consistent statement need not "rebut *every* possible motive to fabricate." *Id.* ¶ 99.

¶53 We agree with the State and find *State v. Green*, 2023 UT 10, 532 P.3d 930, instructive. There, a defendant was charged with several counts of sexual assault and rape against six women. *Id.* ¶ 7. The defendant "challenge[d] the trustworthiness of his accusers" at trial, alleging that their accusations were fabricated. *Id.* ¶ 88. While the defendant primarily asserted that the women fabricated their allegations because they were influenced by newspaper articles detailing other women's allegations against the defendant, the defendant also identified other potential motives to fabricate, "some of which theoretically arose immediately after the rapes occurred" and therefore before the publishing of the newspaper articles. *Id.* ¶¶ 86, 88. The defendant

argued the women's statements from before the publication of the newspaper articles should not be admitted under rule 801(d)(1)(B) because the statements were not "given before *any* potential motive to fabricate arose." *Id.* ¶ 86. Our supreme court disagreed, holding that rule 801(d)(1)(B) "does not require that [a] statement rebut *every* possible motive to fabricate" but only that a statement "tends to rebut one of them." *Id.* ¶¶ 99–100 (cleaned up).

¶54 Similar to the defendant in *Green*, Christensen raised several possible theories as to why his daughter was fabricating the abuse allegations. While Christensen groups all these possible influences or motives to fabricate together as "improper interview techniques," we see several different potential influences or motives to fabricate. First, there was Officer 4's interview techniques, including the presence of another witness during the interview and Officer 4 conducting the interview when he himself was an alleged victim. Next, there was Detective's conversation with Nadine before the CJC interview and their frequent conversations after the CJC interview that made Nadine consider Detective "a close friend." And finally, there was a change of interviewers during the CJC interview that could have signaled to Nadine that she was not "giving the right answers to the first interviewer."

¶55 Even though all of the influences or motives to fabricate raised by Christensen involve some sort of "improper interview technique[]," we do not see all of the allegations as one singular influence or motive to fabricate that began during Nadine's interview with Officer 4. While having another witness present during an interview of a victim, having an interview conducted by another victim, changing interviewers mid-interview, and developing a relationship with a victim prior to an interview could all be broadly categorized as "improper interview techniques," the influences or motives to fabricate underlying them were not all the same. One such motive recognized by the district court—that Nadine fabricated her allegations because

"she was motivated by a relationship with Detective"—arose after Nadine's interview with Officer 4 because Nadine did not meet Detective until the morning of the CJC interview and she was interviewed by Officer 4 shortly after the police responded to Christensen's house.

¶56 Thus, the Interview Footage was a prior consistent statement and "not hearsay" under rule 801(d)(1)(B) because it rebutted "*an* express or implied charge" of fabrication and the interview was conducted before *a* motive to fabricate arose, namely Nadine's relationship with Detective. Utah R. Evid. 801(d)(1)(B) (emphasis added); *see also State v. Repsher*, 2025 UT App 50, ¶ 42 (holding that consistent testimony that predates the defendant's fabrication theory is admissible even where the "fabrication argument might be a touch unclear"). Because the Interview Footage was "not hearsay" under rule 801(d)(1)(B), the district court did not abuse its discretion in admitting it at trial.[5]

---

5. Christensen also raises an alternative ineffective assistance of counsel claim "[t]o the extent this Court believes counsel did not adequately argue the flaws in [Officer 4's] interview to the district court." To prevail on his ineffective assistance of counsel claim, Christensen must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure "to establish either element defeats a claim for ineffective assistance of counsel." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023). Because we have determined that the Interview Footage was admissible under rule 801(d)(1)(B), *see supra* ¶¶ 49–56, Christensen cannot demonstrate the prejudice required to succeed on a claim of ineffective assistance of counsel. Simply put, Christensen "could not have been prejudiced by properly admitted testimony, so his ineffective assistance of counsel claim[] fail[s]." *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546.

CONCLUSION

¶57 We affirm the district court's denial of Christensen's motion to sever because he has not demonstrated a reasonable likelihood of a more favorable outcome if the motion to sever had been granted. We also affirm the district court's admission of the Interview Footage at trial because it qualified as a prior consistent statement under rule 801(d)(1)(B). We therefore affirm Christensen's convictions.

—————