*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 36**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

LUCIANO GABRIEL SILVA,
*Appellant.*

No. 20161045
Filed July 23, 2019

On Direct Appeal

Second District, Weber County
The Honorable Ernest W. Jones
No. 151901996

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey D. Mann, Asst. Solic. Gen., Salt Lake City, Branden B. Miles, Letitia J. Toombs, Josh B. Wayment, Ogden, for appellee

Cherise Bacalski, Orem, Emily Adams, Bountiful, for appellant

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 Luciano Silva was convicted of murder after shooting and killing his roommate's friend. He challenges his conviction on this appeal, asserting that the trial court committed reversible error when it (1) precluded him from arguing perfect self-defense and (2) refused to declare a mistrial after the prosecutor asked Silva to demonstrate the shooting using a facsimile gun. We disagree. Any error the trial court committed when it refused to allow a claim of perfect self-defense was harmless. And though we are troubled by aspects of the demonstration directed by the prosecutor, we cannot

say that the trial court abused its discretion when it denied Silva's motion for a mistrial. We therefore affirm the conviction.

I

¶2 On the night of the shooting, Silva returned home to his trailer to find his roommate, Fabricio, with a friend, Horacio. Silva did not know Horacio. But he soon learned that Horacio was previously a member of the Norteño gang—the same gang Silva once belonged to.

¶3 Silva offered to buy methamphetamine and share it with Fabricio and Horacio. He made a phone call and arranged for a drug delivery. While waiting for the delivery, Horacio listened to music by the Salineros, a group associated with the Norteños. Silva questioned Horacio about the music before going to his bedroom. There he mentioned to Fabricio that he was bothered by the music. And he cleaned some bullets for his gun—a gun that he had purchased illegally, allegedly for protection from his former gang.

¶4 Silva eventually learned that the drug delivery had failed. Undeterred, he decided to walk to another seller's home. Silva first asked Fabricio to accompany him. But Fabricio said he wasn't interested in going. So Silva asked Horacio to accompany him and he did. About ten to fifteen minutes later, Silva returned home alone without any drugs. He claimed that Horacio had left him at some point during the walk.

¶5 The next morning, Horacio's body was found with a gunshot wound to the back of the head. While police were trying to identify Horacio, Silva and Fabricio went to Walmart to buy some groceries. On the way there, Silva admitted to Fabricio that he had shot Horacio in the back of the head. And he explained that he shot him because he was listening to Norteño music.

¶6 Police eventually identified Horacio using his cell phone. They also discovered a photo from Horacio's Facebook account that showed the license plate of a vehicle registered to Silva's address. So an officer was assigned to observe Silva's trailer.

¶7 Later that day, Silva left his trailer to go pick up his daughter. He was immediately approached by the police. They asked if he knew Horacio, and at first he lied. But he eventually admitted he knew him but not well. And he agreed to go to the police station for further questioning. At the station, Silva again concealed the truth in his initial interactions with the police. But he eventually came clean. He told the police that he and Horacio were on their way to purchase drugs when Horacio discovered that he

was carrying a gun. He said that Horacio had asked him if he could hold the gun, that Silva had handed it over, and that Horacio had then turned the gun on Silva and asked to see the money that Silva had brought to purchase drugs. Silva indicated that he had knocked the gun out of Horacio's hand, pushed Horacio back, gained control of the gun, and fired a shot at the back of Horacio's head. After shooting Horacio, Silva said he had thrown the gun into a nearby river and then went home and hid the clothes he was wearing under his bed.

¶8   When asked about the details of the shooting, Silva admitted that he knew Horacio was facing away from him when he shot him and that Horacio was unarmed. But he stated that Horacio was turning towards him when he shot him. He also told police that he felt "comfortable" just before the shooting. And he acknowledged that instead of shooting Horacio he could have ran away or "pointed the gun at him and walked away."

¶9   The State charged Silva with first-degree murder, two counts of obstructing justice (for his efforts to hide the gun and his clothing), and one count of possession of a firearm by a restricted person (because Silva is an illegal alien). Before trial, the State moved pursuant to Utah Code section 76-2-402(2)(a)(ii) to preclude the jury from considering perfect or imperfect self-defense. That section prohibits a person from using force in self-defense if the person "is attempting to commit, committing, or fleeing after the commission or attempted commission of a felony." UTAH CODE § 76-2-402(2)(a)(ii) (2017).[1] The State argued that the felonious conduct Silva was engaged in when he killed Horacio was (1) attempted possession of methamphetamine and (2) possession of a firearm by a restricted person. *See id.* §§ 58-37-8, 76-10-503(2)(a) (2014) (defining respectively the crimes of possession of a controlled substance and possession of a firearm by a restricted person).[2] Silva

---

[1] We cite the 2017 version of the statute, while noting that this section was amended in 2018, *see* UTAH CODE § 76-2-402(2)(a)(ii) (2018), because the incident giving rise to this case occurred in September 2015.

[2] Section 58-37-8 was amended in 2015. Under the amended statute a first or second conviction of possession of a Schedule I or II controlled substance constitutes a class A misdemeanor. UTAH CODE § 58-37-8(2)(b)(ii) (2015). That amendment, however, did not take

(continued . . .)

conceded that he was an illegal alien in possession of a firearm. But he argued that the statute as applied to him unconstitutionally infringed his right to self-defense. He also argued that the statute should not apply because he was not attempting to purchase drugs or fleeing from such an attempt when the shooting occurred. The trial court rejected both arguments. It ruled that the jury could not consider perfect self-defense because Silva was "involved in two felonies at the time of the homicide"—the two identified by the State. Yet "while [Silva] [was] not entitled to claim 'perfect' self-defense," the court allowed him to argue "'imperfect' self-defense to the jury."

¶10 At trial, Silva largely retold the narrative he provided to the police. But his testimony varied in key ways. He testified that he felt scared, rather than comfortable, just before he shot Horacio. And he stated that he was not sure whether Horacio was facing towards or away from him when he shot him. He also testified that he thought Horacio may have had a weapon at the time he shot him, contradicting his prior statement. He maintained, however, that Horacio was turning towards him when he shot him. And he again conceded that he had other options besides shooting Horacio, including throwing the gun out of Horacio's reach or simply running away.

¶11 During cross-examination, the prosecutor gave Silva a "facsimile gun" and asked him to "demonstrate exactly how [he] was holding the gun when [he] shot Horacio." The prosecutor then separated himself some distance from Silva, turned away from him, and asked him if he thought his life was in danger. Silva said no. The prosecutor repeated this question two more times while slowly turning towards Silva. And Silva reaffirmed both times that he did not feel in danger. Silva's counsel interjected, noting "for the record" that the prosecutor "had his back turned and then he turned around forward and then held his hands up." He also noted the differences between the courtroom setting and the setting of the shooting—specifically that they were "in a courtroom . . . with bailiffs, et cetera." During re-examination, Silva clarified that he did not feel in danger during the demonstration because he was in a courtroom; he misunderstood that the prosecutor was speaking of the night he killed Horacio.

---

effect until October 1, 2015, after the incident giving rise to this case. We accordingly refer to the 2014 version of the statute.

¶12 Following Silva's testimony, his trial counsel moved for a mistrial. Counsel asserted that it was "horrendously prejudicial" for the jury to see the reenactment and a gun in Silva's hand and that the demonstration should have been disallowed under Utah Rule of Evidence 403. The prosecutor responded that Silva's "actions [were] central to the issues of this case." He further argued that Silva never denied the fact that he had held a gun or killed Horacio. So "[t]he fact that he held a plastic gun in court in an effort to aid the jury in understanding what happened . . . was relevant and not prejudicial." The trial court agreed with the prosecutor. It denied the motion for a mistrial, stating that the demonstration was not "prejudicial at all" but was rather "central to the whole case." The jury ultimately convicted Silva on all counts. He appealed the murder conviction to this court. We initially transferred the matter to the court of appeals but later vacated the transfer and recalled the appeal.

## II

¶13 On appeal, Silva argues that the trial court committed two principal errors. He first asserts that the trial court erred when it prevented him from arguing perfect self-defense. Second, he asserts that the court abused its discretion when it denied his motion for a mistrial based on the prosecutor's gun demonstration.

¶14 We disagree with Silva and thus affirm his conviction. Even if we assume that the trial court erred when it refused to offer the perfect self-defense instruction, such error was harmless because it didn't result in prejudice to Silva. And though we find aspects of the prosecutor's demonstration troubling, we affirm the trial court's decision to deny Silva's motion for a mistrial. Our decision is driven by the standard of review, the relevancy of the demonstration, the lack of record evidence, and the opportunities afforded defense counsel to clarify Silva's testimony. We advise future attorneys, however, to proceed cautiously when considering the propriety of a demonstration like the one here. Requiring a criminal defendant to hold a facsimile gun is not per se a violation of rule 403 of the Utah Rules of Evidence. But such a demonstration certainly has the potential to run afoul of that rule and to trigger a mistrial.

## A

¶15 Silva first asserts that the trial court erred in precluding him from arguing perfect self-defense at trial. The governing statute is Utah Code section 76-2-402(2)(a)(ii). That statute prohibits a person from using force in self-defense if the person "is attempting to commit, committing, or fleeing after the commission or attempted

commission of a felony." UTAH CODE § 76-2-402(2)(a)(ii) (2017). The trial court refused to instruct the jury on perfect self-defense on the ground that Silva was engaged in two felonious acts at the time he killed Horacio—attempted possession of methamphetamine under Utah Code section 58-37-8 and possession of a firearm by a restricted person under Utah Code section 76-10-503(2)(a).

¶16 Silva challenges the trial court's refusal to give a perfect self-defense instruction on three grounds: (1) the statute infringes his constitutional right to equal protection by foreclosing an allegedly fundamental right of self-defense for illegal aliens without an adequate justification; (2) there was insufficient evidence that Silva was attempting to purchase drugs at the time of the shooting; and (3) his trial counsel was ineffective in failing to argue that it would be absurd to interpret the statute to foreclose a right of self-defense even when there is no connection between the underlying felony and the act of self-defense.

¶17 These claims are not insubstantial. First, Silva plausibly asserts that the right of self-defense is "fundamental" and raises serious questions about the sufficiency of the government's justification for foreclosing that right for illegal aliens. On the second point, Silva raises significant questions about the nature of the alleged "attempt" to purchase drugs, and whether he was in the course of committing such a crime when the shooting occurred. And the third point implicates an important question about the appropriate standard for assessing ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984).

¶18 Silva's ineffective assistance of counsel claim focuses on his trial counsel's failure to seek to limit the reach of Utah Code section 76-2-402(2)(a)(ii) on the basis of the doctrine of absurdity. In Silva's view, trial counsel was ineffective in failing to assert that it would be absurd to extend the statutory bar to the use of force in self-defense where there is no causal connection between the underlying felony and the self-defense statute.[3] The State, for its part,

---

[3] The statute was amended in 2018 to require such a causal connection. A criminal defendant is now permitted to argue perfect self-defense where "the use of force is a reasonable response to factors unrelated to the commission, attempted commission, or fleeing after the commission of th[e] felony." UTAH CODE § 76-2-402(3)(a)(ii).

defends the conduct of trial counsel on the ground that there was no controlling case law in effect at the time of trial that would have dictated the argument under the doctrine of absurdity. And the State cites cases from our court and the court of appeals that suggest that counsel's representation must be judged by reference only to settled law in effect at the time of trial.[4] Silva responds by challenging the viability of this line of cases, and noting that they are inconsistent with binding precedent from the United States Supreme Court.

¶19 We take Silva's point. A showing of ineffective assistance of counsel requires proof (1) that trial counsel's representation "fell below an objective standard of reasonableness" and (2) that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687–88. This analysis is conducted under "the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). But the United States Supreme Court has never said that trial counsel is categorically excused from failure to raise an argument not supported by existing legal precedent. In fact, the Court has said just the opposite. In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Court held that an attorney's representation fell below an objective standard of reasonableness notwithstanding the fact that no precedent at that time established that an attorney has a duty to inform a defendant about the immigration consequences of a plea. So it cannot be that we judge an attorney's performance based only on settled law.

¶20 We thus repudiate the language in our case law limiting our review of an attorney's performance to the law in effect at the time of trial. Ineffective assistance of counsel claims are premised on the protections provided by the Sixth Amendment of the United States

---

[4] *See State v. Dunn*, 850 P.2d 1201, 1228 (Utah 1993) ("[A] defendant bears the burden of demonstrating why, on the basis of the law in effect at the time of trial, his or her trial counsel's performance was deficient."); *State v. Bruun*, 2017 UT App 182, ¶ 68, 405 P.3d 905 ("[C]ounsel is not ineffective for failing to advance a theory or interpretation of the law which has not yet been settled or ruled upon by our courts."); *State v. Edgar*, 2017 UT App 53, ¶ 10, 397 P.3d 670 ("Counsel 'cannot be faulted for failing to advance a novel legal theory which has never been accepted by the pertinent courts.'" (citation omitted)).

Constitution. *Strickland*, 466 U.S. at 685–86.[5] The standards for adjudicating such claims are thus a matter of federal law. And it is not our prerogative to establish doctrines that contradict binding precedent from the United States Supreme Court. With this in mind, we now concede that we were wrong to suggest that we may assess the reasonableness of defense counsel's performance only in light of the law in effect at the time of trial. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.

¶21 The fact that Silva has raised serious claims on the merits is not alone sufficient to sustain reversal, however. We can assume for the sake of argument that Silva's three claims may have merit—that there may arguably be an equal protection problem with the statutory bar on an illegal alien's use of force in self-defense, that Silva may not have been in the course of attempting to purchase drugs when he killed Horacio, and that counsel's performance fell below an objective standard of reasonableness. Yet even assuming these errors, we can reverse Silva's conviction only if the errors are prejudicial. *See State v. Reece*, 2015 UT 45, ¶ 21, 349 P.3d 712. And we are convinced that they are not.

¶22 The prejudice standards implicated here are overlapping but somewhat different. For preserved constitutional claims—like Silva's equal protection claim—the State bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt.[6] In contrast, for unpreserved constitutional claims—like Silva's ineffective assistance of counsel claim—the burden of demonstrating prejudice rests on the defendant.[7] The same goes for

---

[5] *See also Gideon v. Wainwright*, 372 U.S. 335, 342–45 (1963) (incorporating the right to effective assistance of counsel against the states).

[6] *See Chapman v. California*, 386 U.S. 18, 24 (1967) ("Certainly error, constitutional error . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless. . . . [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); *State v. Bond*, 2015 UT 88, ¶¶ 37–38, 361 P.3d 104 (articulating this same standard).

[7] *See United States v. Olano*, 507 U.S. 725, 734 (1993); *Strickland*, 466 U.S. at 693–96; *Bond*, 2015 UT 88, ¶ 46.

Silva's insufficiency of the evidence claim—he bears the burden of demonstrating that this error was prejudicial. *See State v. Robertson*, 932 P.2d 1219, 1227 (Utah 1997), *overruled on other grounds by State v. Weeks*, 2002 UT 98, ¶ 25 n.11, 61 P.3d 1000.

¶23 We conclude that there is a lack of prejudice here under any of the above standards. The failure to give a perfect self-defense instruction was harmless under any of the above formulations.

¶24 We begin by emphasizing the substantial overlap between the defenses of imperfect and perfect self-defense. Imperfect self-defense is a strict subset of perfect self-defense. So if a theory of imperfect self-defense is rejected by a jury—as was the case here—it may logically follow that a theory of perfect self-defense would likewise be rejected.

¶25 Self-defense is an affirmative defense that justifies "using force against another when and to the extent that the person reasonably believes that force . . . is necessary to defend the person . . . against another person's imminent use of unlawful force." UTAH CODE § 76-2-402(1)(a) (2017). Self-defense may be perfect or imperfect. Perfect self-defense is a complete justification and bars a conviction. *See id.* It applies when a defendant reasonably believes that unlawful force against him is imminent *and* he is legally justified in using force to defend himself. Imperfect self-defense is a partial justification. It reduces a murder charge to manslaughter when a defendant reasonably, but mistakenly, believes "that the circumstances provided a legal justification or excuse" for the use of deadly force. *Id.* § 76-5-203(4)(a).

¶26 "[F]or both perfect and imperfect self-defense, the same basic facts [are] at issue." *State v. Low*, 2008 UT 58, ¶ 32, 192 P.3d 867 (second alteration in original) (quoting *State v. Spillers*, 2007 UT 13, ¶ 23, 152 P.3d 315) (internal quotation marks omitted). Both "require the defendant to present the same evidence: that the defendant had a reasonable belief that force was necessary to defend himself." *Id.* The only difference between the two defenses is that a defendant arguing perfect self-defense must show that the use of deadly force was legally justifiable under the circumstances. *Id.*

¶27 The jury here was presented with the theory of imperfect self-defense. And it rejected that theory. Because the jury rejected the notion that Silva *reasonably but mistakenly* believed that deadly force was necessary, there is a strong argument that the jury likewise would have rejected the notion that Silva *reasonably and correctly* believed that such force was necessary. This argument is bolstered

when we consider the substantial evidence undermining Silva's claim of self-defense. *Infra* ¶¶ 30–32. In light of this evidence, we may assume that the trial court erred when it refused to allow Silva to argue perfect self-defense but nonetheless affirm on the basis of a conclusion that any such error was harmless.

¶28 Silva challenges this logic. He claims that a reasonable jury could reject imperfect self-defense but endorse perfect self-defense. He bases that assertion on alleged confusion about the distinction between perfect and imperfect self-defense, which in his view was reflected in the instruction given to the jury in this case.

¶29 We disagree. The line between perfect and imperfect self-defense is subtle but clear.[8] Perfect self-defense requires that a defendant's belief that force is necessary be both reasonable and legally justified. Imperfect self-defense, meanwhile, requires only that the defendant's belief be reasonable. The jury instruction in this case accurately reflected this distinction and correctly explained the parameters the defense: "Imperfect self-defense . . . applies when the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was justified." This was an accurate statement of law. And Silva has identified no basis for a determination that the jury in this case must have misunderstood the law of imperfect self-defense.

¶30 Silva's argument, moreover, runs into a brick wall of evidence—the evidentiary record at trial. We assess the question of prejudice in light of all the evidence presented at trial. *See Reece*, 2015 UT 45, ¶ 40. And here the State presented substantial evidence confirming Silva's guilt—and undermining his assertion of imperfect self-defense. First is Silva's testimony, which was inconsistent and undermined his claim of self-defense. Silva initially told police that he knew Horacio was facing away from him when he shot him. But at trial he said he was unsure which way Horacio was facing. He

---

[8] In so stating we do not mean to suggest that the legal lines in this field are always straightforward. The experienced trial judge in this case referred to the imperfect self-defense jury instruction as "the most confusing . . . concept [he'd] ever dealt with." Hopefully our opinion in this case will help alleviate some of the confusion. We also note that the Judicial Council's Model Utah Jury Instructions Committee has recently added model instructions on imperfect self-defense. *See* MUJI 2d CR 1450–52.

also told police that he knew Horacio was unarmed. Yet he told the jury that he was unsure of that fact. Silva claimed at trial that it was too dark to see which way Horacio was facing. But he claimed that he could see several other details that night, including the gun pointed at his chest, which way Horacio's hat was facing, the gun on the black asphalt, and the shot in the back of Horacio's head. And Silva conceded at trial that he had other options besides shooting Horacio including throwing the gun out of Horacio's reach or running away.

¶31 Silva's trial testimony is also undermined by the statements he made to his roommate, Fabricio. He initially told Fabricio that Horacio left him some time during their walk to purchase drugs. His story changed the next day when he admitted that he killed Horacio. But he never claimed to have acted in self-defense. Rather he told Fabricio that he shot Horacio because Horacio had been listening to Norteño music.

¶32 The physical evidence further undermines Silva's claim of self-defense. Horacio was shot in the back of the head. And the bullet went straight through, suggesting that Horacio was facing away from Silva when he was shot, not turning, and thus not in a position to cause imminent harm to Silva. Nor was there any indication in the record of a struggle between Silva and Horacio over the gun—no evidence of any injury to either (other than the fatal shot to Horacio's head), or any other basis for the jury to conclude that there was a struggle. All of this suggests that even if Silva had been allowed to argue perfect self-defense, the jury likely would have convicted him of murder anyway.

¶33 Silva proffered a final basis for establishing prejudice during oral argument to this court. His counsel asserted that the reasonable belief required for perfect self-defense is different from the reasonable belief required for imperfect self-defense. And he claimed that the jury might thus have found in his favor had he been allowed to present a theory of perfect self-defense. This assertion fails on two counts. The first problem is one of timing. This argument was raised for the first time at oral argument, and "[w]e do not address issues raised for the first time during oral argument." *Porenta v. Porenta*, 2017 UT 78, ¶ 33, 416 P.3d 487. The second problem is more substantive. The argument is premised on a misstatement of our law. The difference between perfect and imperfect self-defense goes to legal justification, not the standard of reasonable belief. Imperfect self-defense requires a "reasonable belief that the circumstances provided a legal justification or excuse for the conduct *although the*

*conduct was not legally justifiable* or excusable under the existing circumstances." UTAH CODE § 76-5-203(4)(a) (emphasis added). Perfect self-defense similarly requires a "reasonable belief," but it also requires that the use of force be legally justifiable under the circumstances. *See id.* § 76-2-402 (2017); *State v. Low*, 2008 UT 58, ¶ 32, 192 P.3d 867. The standard for "reasonable belief" is the same for both defenses. The difference goes only to whether the acts of self-defense were "legally justifiable." And Silva's last argument would thus also fail even if we were to reach it.

¶34 For these reasons we decline to reach the merits of Silva's arguments regarding his right to assert perfect self-defense. We conclude that even if he was entitled to a perfect self-defense instruction, there is no reasonable likelihood that the trial would have turned out differently if the jury had been instructed on that defense. The State has demonstrated harmlessness beyond a reasonable doubt. The alleged errors are thus harmless under any of the prejudice standards implicated here. *See supra* ¶ 22.

B

¶35 Silva's second contention is that the trial court abused its discretion when it refused to grant a mistrial after the prosecutor conducted a demonstration using a facsimile gun. We disagree. Our decision is largely driven by the deferential standard of review. We note below some concerns we have with such demonstrations and advise the bench and bar to carefully consider whether such demonstrations comply with the demands of our rules of evidence. But we affirm because we conclude that the trial court did not abuse its discretion in the circumstances of this trial.

¶36 We review the denial of a motion for a mistrial under an abuse of discretion standard. *State v. Vargas*, 2001 UT 5, ¶ 44, 20 P.3d 271. And "[w]e will not find such abuse unless 'the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial.'" *Id.* (citation omitted). Here we find no such abuse of discretion.

¶37 The demonstration, for starters, had some probative value. The critical question for the jury to decide was whether Silva reasonably believed that he was justified in shooting Horacio. And whether Silva's belief was reasonable turned, at least in part, on facts demonstrated by the prosecutor—as to the way Silva held the gun and the relevant positions of Silva and Horacio. We thus can understand why the trial court stated that the demonstration was "central to the whole case."

¶38 At the same time, we are skeptical of the trial court's sweeping statement that the demonstration was not "prejudicial at all." Seeing a gun in the hands of a defendant will often prejudice the jury against him. This is true even where there is no question that the defendant used a gun to commit the alleged crime, as is the case here. This concern, nonetheless, does not warrant overturning the trial court's decision.

¶39 First we don't have evidence in the record establishing what the facsimile gun looked like. And that could make a difference. Use of a plastic water gun, for example, is less likely to prejudice the jury against the defendant than the use of a real firearm, or a highly realistic facsimile. Though the gun used here may have resembled something closer to a real gun, the record is devoid of detail. We similarly lack evidence regarding the details of the demonstration itself. Silva claims that the prosecutor repeatedly taunted him in front of the jury. Having reviewed an audio recording of the trial, we are skeptical of this claim. Admittedly, we were not privy to the details of the demonstration. Yet the trial judge was. And he determined that the probative value of the demonstration was not substantially outweighed by a danger of unfair prejudice. *See* UTAH R. EVID. 403. That determination is entitled to substantial deference. *See State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (explaining that a district judge "is in an advantaged position to determine the impact of courtroom events on the total proceedings" and applying an abuse of discretion standard of review).

¶40 The trial court also gave defense counsel an opportunity to clarify the factual differences between the demonstration and the shooting. And Silva testified that his responses to the prosecutor's questioning about whether he felt in danger during the demonstration were only meant to convey that he did not feel in danger at that exact moment; he did feel in danger at the time of the shooting. These clarifications soften the potential prejudice the defendant may have faced as a result of the demonstration.

¶41 We reiterate that our decision is largely a result of the standard of review. We affirm the trial court's decision because we are unpersuaded that it abused its discretion, or that the demonstration "so likely influenced the jury that the defendant cannot be said to have had a fair trial." *Vargas*, 2001 UT 5, ¶ 44 (citation omitted) (internal quotation marks omitted). Under different circumstances we might reach a different conclusion. As this case proves, permitting a demonstration in which a defendant holds a facsimile gun does not per se violate rule 403 and justify a

mistrial. But there is a risk that such a demonstration could. And we emphasize that our decision here is not a green light to the use of gun demonstrations at any trial going forward.

### III

¶42 We affirm Silva's conviction for the reasons stated above. We also affirm the trial court's decision to deny Silva's motion for a mistrial, while emphasizing that our decision on that point is largely a product of the deferential standard of review.

––––––––––