**2021 UT App 103**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
AARON DANIEL HOSMAN,
Appellant.

Opinion
No. 20190589-CA
Filed September 30, 2021

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 171906533

Janet Lawrence, Attorney for Appellant

Sean D. Reyes and Daniel L. Day,
Attorneys for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER and
SENIOR JUDGE KATE APPLEBY concurred.[1]

HAGEN, Judge:

¶1     Aaron Daniel Hosman was convicted of first-degree murder after he ran down a pedestrian with his car. Hosman appeals that conviction, arguing the district court erred by (1) denying his motion for mistrial after two state witnesses allegedly opined on the intent element of the murder charge; (2) denying his motion for a directed verdict, which challenged the sufficiency of the evidence to establish the required mental state on the murder charge; and (3) failing to remedy alleged

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

prosecutorial misconduct during closing arguments. We reject all three challenges and affirm Hosman's conviction.

## BACKGROUND[2]

### *The Offense*

¶2    A carpet layer (the victim) and his coworker were driving to a job site in Salt Lake City when they saw Hosman "beating" a chihuahua, Buddy, at the corner of 4100 South and 3600 West in West Valley City (the intersection). The abuse angered the victim and made the coworker "sick to [his] stomach," so they decided to "confront the guy." The coworker abruptly turned around their SUV, drove back toward the intersection, and pulled over. The two men left the SUV to "fuck [Hosman] up."

¶3    At the street corner, the victim and the coworker confronted Hosman, who was now holding Buddy under his arm "like you would a football." An eyewitness testified that she saw the victim "was very escalated"—he "puffed out" his chest, "balled up" his fists, and gave Hosman "a very intense stare." The two men "tried to instigate [Hosman] into coming at" them by using "aggressive words." One witness testified that the victim threatened to "cut [Hosman] up into little pieces" if he ever saw Hosman "hurt any animal again like that." The two men tried to block Hosman's way, but Hosman was able to walk to his car with Buddy and drive away from the intersection.

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

¶4    The victim and his coworker returned to their SUV and continued toward their job site until the victim realized he was missing a bag of methamphetamine (meth). Both the victim and his coworker regularly used meth and had been preparing to smoke the drug before they were sidetracked by seeing Hosman hit Buddy. The men pulled over to the side of the road to search the SUV for the meth.

¶5    Meanwhile, Hosman made a U-turn, headed back toward the intersection, and pulled up alongside the victim and his co-worker. Hosman yelled, "Come follow me, motherfucker!" then continued driving. The two men "laughed it off" because "the moment had passed" and their anger had dissipated; they continued searching for the lost meth. Concluding he must have dropped the bag during the earlier confrontation with Hosman, the victim jumped out of the SUV and ran back to the intersection to find the drugs.

¶6    When the men failed to follow him, Hosman made a second U-turn and drove back toward the intersection. Now driving west on 4100 South, Hosman approached the intersection as the victim was in the 3600 West crosswalk in front of one of the three northbound lanes. Hosman sped past slowing traffic, "swerved" left into the oncoming 4100 South lanes, and made a southbound, left-hand turn onto 3600 West. Rather than turning into a southbound lane, Hosman cut across the northbound lanes and struck the victim—without slowing down or leaving any brake marks. Hosman's car was traveling at approximately thirty-five to forty miles per hour[3] when it

---

3. Hosman admitted in a police interview that he was travelling thirty-five to forty miles per hour. A witness estimated that Hosman's car was travelling around forty miles per hour. An accident reconstructionist later determined that the car was

(continued…)

"clipped [the victim's] legs out from underneath him." The victim "hit the windshield" with the back of his head, "bounced off," and was "propelled into the air forward," flipping "head over heels." The victim struck a telephone pole approximately fifty-four feet away and slumped to the ground. Within minutes he was dead.

¶7     Hosman did not stop, call for help, or notify the police. When he was apprehended by police three days later, he had spray painted part of his car white, removed the smashed windshield and identifying window stickers, changed the license plate, replaced the distinctive mismatched rims, and concealed the car under a tarp.

*Motion for Mistrial*

¶8     Relevant to this appeal, the State charged Hosman with one count of first-degree murder with a dangerous weapon. Before trial, Hosman filed a motion in limine to preclude the State's witnesses from opining on his intent.[4] Specifically, Hosman argued that if a State witness were to opine on Hosman's intent, it would "constitute an impermissible legal conclusion in violation of rules 701 and 704 of the Utah Rules of Evidence." At the final pretrial conference, the prosecutor agreed that Hosman's motion "was not in dispute." The record does not reflect the details of the agreement, but the State does not

(…continued)

travelling between twenty-four and thirty-six miles per hour when it struck the victim.

4. "A motion in limine is a procedure for obtaining a ruling on the admissibility of evidence prior to or during trial, but before the evidence has been offered." *State v. Bermejo*, 2020 UT App 142, ¶ 8 n.4, 476 P.3d 148 (cleaned up).

dispute that the parties "reached a stipulation that a State witness would not opine on Hosman's intent."[5]

¶9 On the second day of trial, the State's traffic accident reconstructionist testified as an expert. The expert's analysis confirmed that Hosman's car entered the intersection and struck the victim traveling between twenty-four and thirty-six miles per hour. The expert testified that "if the vehicle braked or turned sharply, the wheels will leave rubber on the asphalt," yet he saw no "braking marks" from Hosman's tires.

¶10 During cross-examination, defense counsel asked the expert whether he would agree that the other officers had not started processing the scene until he had arrived. The expert responded, "Not really. We were just trying to get a gist of— figure out which way—because there was a question of whether this was intentional or an accident. And then we started interviewing people and then we collaborate, 'Okay, this is going to be an intentional.'" Counsel did not object to this testimony and continued the cross-examination.

¶11 The next day, the State called the case agent to testify as a fact witness about the murder investigation. The case agent explained that a "traffic investigator" team normally investigates traffic accident fatalities and that "traffic investigators" and "patrol officers" had initially responded because they believed it was a "hit-and-run type accident." The case agent, on the other hand, was an investigator for the "major case squad." He was

---

5. On the second day of trial, before the State's medical examiner testified, defense counsel reiterated that the State's witnesses could not opine on intent. The prosecutor instructed the medical examiner "that he can't say 'intentional'" and explained that he was not worried about such testimony from any other witness "[o]ther than the ones that have already testified."

called out approximately an hour-and-a-half after the collision occurred because the accident reconstruction team had gathered information that "this is possibly not an accident, that this is possibly an intentional hit-and-run situation to where the driver of a vehicle had intentionally hit somebody and then left the scene." Defense counsel objected and moved for a mistrial. The court deferred argument and its ruling on the motion until after the State had completed its direct examination of the case agent. The prosecutor then focused his questions on what occurred after the case agent arrived on the scene.

¶12 Outside the jury's presence, defense counsel argued that a mistrial was warranted "based on some comments made by [the case agent] in the very initial portion of his testimony." Defense counsel argued that the State violated the stipulation that no State witness would opine on intent when it elicited testimony from the case agent "that he had received some information that, perhaps, this was not an accident, that it would be a potential— that it was an intentional hit-and-run accident." Defense counsel noted that the expert had "also made a comment regarding whether or not this was an intentional act or an accident." Defense counsel had not objected to that testimony but explained that the case agent's testimony was more objectionable because he was the lead investigator, had been at every court proceeding, and knew that the State's witnesses were not supposed to offer an opinion regarding Hosman's intent.

¶13 The district court concluded that the case agent had not opined on intentionality but testified "only that intentionality was questioned, so that's why and how they proceeded with their investigation. And it's also why and how the charges [were] made as they [were]." The court further concluded that the case agent's testimony did not "overstep[] into a legal conclusion or direct[] the jury to go one way or the other." And it found that the prosecutor "immediately addressed the issue to ensure that the witness did not go further." The court further

concluded that nothing "would impair [Hosman's] ability to have a fair trial." Nonetheless, the court offered to consider a curative instruction should the defense find it helpful, but defense counsel never requested one.

*Directed Verdict Motion*

¶14   Later, during cross-examination, the case agent agreed with defense counsel that Hosman had repeatedly said during his police interview that "he did not want to hit [the victim]." After the State's case in chief, defense counsel moved for a directed verdict on the murder count, arguing that the State had not met its burden to prove the intent required for murder, only manslaughter. Specifically, the defense argued "the evidence ha[d] been insufficient to establish that [Hosman] acted with a reckless intent to have committed a murder" because witness testimony was "inconsistent" regarding "where [the victim] was in the intersection when he was struck" and "which lane [Hosman] came from at the time that he made his turn." The court denied the motion, ruling that "the State has met its burden to establish sufficient evidence from which a jury, acting reasonably, could convict the defendant."

*Closing Arguments*

¶15   In closing argument, the State asserted that Hosman was guilty of murder with a dangerous weapon under any one of three theories: (1) intentionally or knowingly taking a life; (2) intending serious bodily injury while committing an act clearly dangerous to life; and (3) knowingly engaging in conduct that creates a grave risk of death while showing depraved indifference. With respect to the third theory, the State argued that "the best evidence of [Hosman's] utter callousness and complete indifference" was that "there are no tire skid marks. [Hosman] didn't brake." Defense counsel did not object to this argument.

¶16   In rebuttal, the prosecutor focused on "two pieces of evidence that can prove this case . . . beyond a reasonable doubt." First, he reminded the jury, "You saw the damage done to this car. You know what caused that, [the victim's] head. His head. That's how fast [Hosman] was going." Second, the prosecutor reiterated that "there [were] no tire skid marks. He did not brake." The prosecutor also addressed whether Hosman took a sharp or wide turn before striking the victim. The prosecutor explained that when "one is making a normal left-hand turn, you continue and then you turn to your left, and that's a sharp turn." He continued, "[I]n order to maintain the speed that even [Hosman] says he was at, he couldn't make that kind of turn. I would submit to you that is evidence of the wide turn, which is actually inside the sharp turn. But that's how he can maintain that speed that he needs in order to cause the body to fly the distance that it flies." Defense counsel did not object to any of the rebuttal arguments.

¶17   The jury found Hosman guilty of first-degree murder. Hosman appeals his conviction.

## ISSUES AND STANDARDS OF REVIEW

¶18   Hosman makes three challenges on appeal. First, he challenges the district court's denial of his motion for a mistrial. "We review the denial of a motion for a mistrial under an abuse of discretion standard." *State v. Silva*, 2019 UT 36, ¶ 36, 456 P.3d 718 (cleaned up).

¶19   Second, Hosman challenges the court's denial of his motion for a directed verdict on the murder charge. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168.

¶20 Third, Hosman argues that the court failed to intervene when, according to Hosman, the State committed prosecutorial misconduct by mischaracterizing the evidence during closing arguments. Because Hosman "raised no objection at trial, our review is for plain error." *See State v. Hummel*, 2017 UT 19, ¶ 105, 393 P.3d 314. Hosman must show that the prosecutor's alleged "missteps were so egregious that it [was] plain error for the district court to decline to intervene sua sponte."[6] *Id.* ¶ 110 (cleaned up).

## ANALYSIS

### I. Witness Testimony

¶21 Hosman first argues that the district court should have granted a mistrial after two State witnesses—the case agent and the expert—allegedly opined on whether he acted with the mental state required for murder. When improper testimony is presented to the jury, the district court must determine whether "the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Silva*, 2019 UT 36, ¶ 36, 456 P.3d 718 (cleaned up). Under Utah law, "a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730. But this standard, which relies on the district court's "advantaged position to determine the impact of courtroom events on the total proceedings," *id.* ¶ 39, presupposes that improper testimony has been presented. In this

---

6. "Sua sponte" is a Latin term meaning "on its own motion" or "[w]ithout prompting or suggestion." *Sua Sponte*, Black's Law Dictionary (9th ed. 2009).

case, the district court ruled that the challenged testimony was not improper. We agree with that assessment.

¶22   Hosman argues that the expert[7] and the case agent "opined on the primary question the jury was tasked with deciding in this case" by suggesting that Hosman's actions were intentional or reckless" and in so doing violated the parties' stipulation and rules 701, 702, and 704 of the Utah Rules of Evidence. As an initial matter, we treat the limits of the stipulation and the rules of evidence as coextensive. The State agreed that Hosman's motion in limine was "not in dispute." That motion sought to "preclude the State's witnesses from opining as to the issue of intentionality at trial" on the grounds that it would violate "rules 701 and 704 of the Utah Rules of Evidence."[8] Therefore, the question on appeal is whether the

---

7. We question whether Hosman properly preserved his challenge to the expert's testimony. During the testimony, Hosman did not raise a contemporaneous objection and did not specifically argue that the expert's testimony was grounds for a mistrial, either standing alone or in conjunction with the case agent's testimony. But because our analysis concerning the case agent's testimony applies equally to the expert's testimony, we address the testimony of both witnesses in our analysis without expressly deciding whether the challenge to the expert's testimony was preserved for appeal. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (Cleaned up.)).

8. Hosman argues that the stipulation was broader, as evidenced by the State's later statement that it would remind a witness not to say the word "intentional." This off-hand comment did not

(continued…)

challenged testimony offered an opinion on Hosman's intent in violation of the rules of evidence.

¶23    Rules 701 and 702 distinguish between permissible lay witness opinion testimony and testimony that must be offered by an expert. A lay witness is limited to offering opinions that are "rationally based on the witness's perception," helpful to the jury in "determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge." Utah R. Evid. 701. When opinion testimony is based on scientific, technical, or other specialized knowledge, rule 702 applies, and the testimony "may be admitted only as expert testimony." *State v. Rothlisberger*, 2006 UT 49, ¶¶ 14–29, 147 P.3d 1176.

¶24    Opinion testimony, from either a lay witness or an expert, "is not objectionable just because it embraces an ultimate issue" to be decided by the jury. Utah R. Evid. 704(a); *see also State v. Davis*, 2007 UT App 13, ¶ 15 n.10, 155 P.3d 909. Nevertheless, "the rule is not intended to allow a witness to give legal conclusions," *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993), such as whether a criminal defendant's handling of a weapon constituted "possession," *Davis*, 2007 UT App 13, ¶ 17, or whether an individual's conduct was "negligent," *Davidson v. Prince*, 813 P.2d 1225, 1231 (Utah Ct. App. 1991). In addition, rule 704(b) expressly prohibits an expert witness from offering "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Utah R. Evid. 704(b). Instead, "these matters are for the trier of fact alone." *Id.*

---

(…continued)
broaden the scope of the State's stipulated agreement that it would not offer the evidence that Hosman sought to exclude, that is, lay witness or expert opinion testimony on Hosman's intent.

¶25    Hosman's challenges fail because neither the case agent nor the expert offered a legal conclusion or opinion testimony regarding Hosman's intent, either as a lay witness or as an expert.[9] He claims that both witnesses impermissibly "stated an opinion about whether Hosman did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." (Cleaned up.) But this overstates the nature of each witness's testimony.

---

9. Hosman also argues that "although [the case agent] testified as a lay witness and had not been qualified as an expert, he provided expert testimony." That issue was not raised at trial, and Hosman has not established plain error on appeal. Hosman argues that the case agent testified as an expert because he "used a technical term that has specialized legal implication" and because his testimony regarded events which were "not based on his personal knowledge." But the case agent was not addressing whether Hosman acted "intentionally" within the meaning of Utah law. *See* Utah Code Ann. § 76-2-103 (LexisNexis 2018). He used the term "intentionally," not as a legal term of art, but to distinguish between how a hit-and-run investigation proceeds if law enforcement receives information to suggest that the driver may have struck the pedestrian on purpose as opposed to accidentally. *See State v. Bryant*, 965 P.2d 539, 548 (Utah Ct. App. 1998) (noting that "a witness may use a legal term, such as conspiracy, where the testimony is factual and not a legal conclusion," and holding that "the victim's casual use of the word, 'robbery,' was factual, not legal" (cleaned up)). At the very least, it would not have been obvious to the district court that such testimony was based on specialized knowledge and could only be provided by an expert. As a result, Hosman has not persuaded us to reach this unpreserved issue under the plain error exception.

¶26    Both witnesses described the course of the investigation as a factual matter. The expert testified that when he arrived on the scene "there was a question of whether this was intentional or an accident. And then we started interviewing people and then we collaborate, 'Okay, this is going to be an intentional.'" The case agent similarly addressed how the investigation evolved. He explained that "traffic investigators" and "patrol officers" initially responded to the scene because they believed it was a "hit-and-run type accident." But eventually the major case squad was called because investigators received information that "this is possibly not an accident, that this is possibly an intentional hit-and-run situation to where the driver of a vehicle had intentionally hit somebody and then left the scene." Both witnesses offered factual testimony to explain why the scene was initially processed as an accidental hit-and-run but later evolved into a murder investigation, not "an opinion about whether [Hosman] did or did not have a mental state or condition that constitutes an element of the crime charged." *See* Utah R. Evid. 704(b).

¶27    The challenged testimony in this case is similar to the testimony at issue in *State v. Maestas*, 2012 UT 46, 299 P.3d 892. In that case, the medical examiner testified about the cause and manner of the victim's death. *Id.* ¶ 17. He "explained that, in his role as a medical examiner, he determines whether an individual's death was natural, a suicide, an accident, or a homicide" and "that the medical determination of homicide is different than the criminal determination." *Id.* ¶ 152. When the prosecution asked "whether the injuries inflicted on [the victim] were 'purposely inflicted,'" the medical examiner "testified that the stab wounds 'appeared to be consistent with an intentional stab wound' and that the strangulation was 'purposefully inflicted.'" *Id.* ¶ 17.

¶28    On appeal, our supreme court held that the medical examiner's testimony that the injuries had been "purposefully

inflicted" did not violate rule 704 because it was not an opinion about whether the defendant had the mental state required to commit the charged crime. *Id.* ¶ 155. The court explained that the medical examiner's testimony was "in the context of his medical determination that [the victim's] death was a homicide, rather than an accident, a suicide, or a natural death." *Id.* It "did not address [the defendant's] mental state while committing the crime" and therefore did not run afoul of rule 704. *Id.*

¶29 Similarly, neither witness offered opinion testimony here as to whether Hosman did or did not have the mental state to commit the crime. Neither witness offered an opinion as to whether Hosman's U-turn, speed, turning angle, failure to brake, or any other facts of the case suggested that Hosman acted "intentionally" within the meaning of Utah law, that is, with a "conscious objective or desire to engage in the conduct or cause the result." *See* Utah Code Ann. § 76-2-103(1) (LexisNexis 2018); *cf. State v. Davis*, 2007 UT App 13, ¶ 17, 155 P.3d 909 (holding that an officer impermissibly offered a legal conclusion when he "applied the facts of the case to the prohibitions in the statute"). As the district court recognized, the testimony did not offer a legal conclusion, but merely informed the jury that the investigative team treated the hit and run as "an intentional" to explain "why and how they proceeded with their investigation." In other words, much like the medical examiner's testimony in *Maestas*, the testimony here was offered in the context of law enforcement's determination to investigate the victim's death as a possible murder as opposed to an accident.

¶30 Because the challenged testimony did not represent the witness's opinions or a legal conclusion regarding Hosman's mental state but rather stated facts regarding how the case was processed, its admission did not violate either the parties' stipulation or the rules of evidence. Accordingly, the district court acted well within its discretion in denying Hosman's motion for a mistrial.

II. Sufficiency of the Evidence

¶31 Next, Hosman argues the district court erred in denying his motion for a directed verdict because the State's evidence was insufficient to "sustain a reasonable inference that Hosman had a nefarious intent." In other words, Hosman claims that the State failed to prove that he acted with the requisite mental state to commit first-degree murder. We accord a jury verdict "high deference" when reviewing for sufficiency of the evidence, *see State v. Hamilton*, 2003 UT 22, ¶ 38, 70 P.3d 111, recognizing that the jury "is the exclusive judge of . . . the weight to be given particular evidence," *State v. Law*, 2020 UT App 74, ¶ 26, 464 P.3d 1192 (cleaned up). "A jury is not obligated to believe the evidence most favorable to the defendant, nor does the existence of contradictory evidence or of conflicting inferences warrant disturbing the jury's verdict on appeal." *State v. Granados*, 2019 UT App 158, ¶ 28, 451 P.3d 289 (cleaned up). "Thus, we will reverse a jury verdict only when the evidence, viewed in the light most favorable to the jury's verdict, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *State v. Covington*, 2020 UT App 110, ¶ 31, 472 P.3d 966 (cleaned up).

¶32 In this case, the State presented sufficient evidence to prove that Hosman acted with the mental state required for murder. Relevant here, "[c]riminal homicide constitutes murder if:"

> (a) the actor intentionally or knowingly causes the death of another;
>
> (b) intending to cause serious bodily injury to another, the actor commits an act clearly dangerous to human life that causes the death of another; [or]

> (c) acting under circumstances evidencing a depraved indifference to human life, the actor knowingly engages in conduct which creates a grave risk of death to another and thereby causes the death of another[.]

Utah Code Ann. § 76-5-203(2) (LexisNexis 2018). Hosman concedes, and the State agrees, that if there is sufficient evidence to prove that Hosman acted intentionally, the lesser mental states are necessarily satisfied. Therefore, we analyze whether the State presented sufficient evidence from which a jury could conclude, beyond a reasonable doubt, that Hosman intentionally caused the death of the victim, *see id.* § 76-5-203(2)(a), or whether he caused the death of the victim by committing "an act clearly dangerous to human life" with the intent "to cause serious bodily injury," *see id.* § 76-5-203(2)(b).

¶33     Under Utah's criminal code, one acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 76-2-103(1). In reaching their verdicts, "[w]e allow juries to rely on circumstantial evidence to find intent on the basis of reasonable inferences drawn from the evidence." *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 11, 358 P.3d 1067. "A jury draws a reasonable inference if there is an evidentiary foundation to draw and support the conclusion." *Id.* ¶ 12. When we review the sufficiency of the evidence, we do so "from a perspective most favorable to the verdict" including "inferences reasonably drawn from the evidence, recognizing that determinations regarding witness credibility are solely within the jury's province." *State v. Smith*, 927 P.2d 649, 651 (Utah Ct. App. 1996). Thus, if the State presented evidence, including circumstantial evidence, from which the jury could reasonably infer Hosman's intent, we will uphold the verdict.

¶34     The State presented ample evidence to support a reasonable inference that Hosman's conscious objective or desire

was to either kill or seriously injure the victim in a manner clearly dangerous to human life that caused the victim's death. Shortly before, the victim had provoked Hosman by aggressively confronting him and threatening to "cut [him] up into little pieces." After the initial confrontation was over, Hosman went out of his way to reengage with the victim, making a U-turn, pulling alongside the victim's SUV, and challenging him to follow. When the victim laughed it off, Hosman, undeterred, made yet another U-turn and drove back toward the intersection. Hosman admitted that he saw the victim in the crosswalk of 3600 West. He sped past other cars to turn left toward the victim and, instead of turning normally into the southbound lanes of 3600 West, cut across the crosswalk in front of the northbound lanes where the victim was positioned. In addition, before making the turn, Hosman swerved into the oncoming lane of traffic on 4100 South, which allowed him to turn at the angle necessary to strike the victim without reducing his speed. This evidence showed that Hosman went to great lengths to hit the victim with his car and was sufficient to prove beyond a reasonable doubt that he did so intentionally. Given that a motor vehicle "is clearly capable of inflicting grave injury or death," *see State v. C.D.L.*, 2011 UT App 55, ¶ 18, 250 P.3d 69, the jury could reasonably conclude that Hosman intended either to kill or seriously injure the victim when Hosman struck him with his car at approximately thirty-five miles per hour.

¶35 Hosman's subsequent behavior further supports the conclusion that he acted intentionally. The evidence showed that the impact caused serious damage to Hosman's car and launched the victim's body through the air into a telephone pole approximately fifty-four feet away. Rather than stopping, Hosman sped off. Shortly thereafter, he took steps to conceal and change the appearance of his car, supporting a reasonable inference that he was trying to avoid apprehension by hiding the murder weapon. "While a defendant's flight from a crime scene,

standing alone, does not support an inference of intentional conduct, the circumstances of a defendant's flight, in addition to other circumstantial evidence, may be adequate to support such an inference." *State v. Holgate*, 2000 UT 74, ¶ 23, 10 P.3d 346 (cleaned up). Considering the totality of the evidence, the jury could reasonably infer that Hosman intended to either kill or cause serious bodily harm to the victim by committing an act clearly dangerous to human life that resulted in the victim's death. Therefore, we reject Hosman's challenge to the sufficiency of the evidence supporting his conviction.

### III. The Prosecutor's Closing Arguments

¶36    Finally, Hosman claims "the prosecutor offered unsworn, unchecked expert opinion about matters not in evidence." Specifically, Hosman challenges three matters on which the prosecutor commented: (1) "that lack of tire skid marks meant that [Hosman] did not brake," (2) "that the damage done to the car was indicative of Hosman's speed," and (3) "that Hosman would need to have made a wide turn in order to maintain his speed."

¶37    "A prosecutor commits misconduct during closing arguments when the prosecutor's actions or remarks call to the attention of the jury a matter it would not be justified in considering in determining its verdict." *State v. Almaguer*, 2020 UT App 117, ¶ 12, 472 P.3d 326 (cleaned up). But, to preserve an issue for appeal, a defendant must lodge "a timely and specific objection" in the district court. *State v. Rogers*, 2020 UT App 78, ¶ 47, 467 P.3d 880 (cleaned up). Because Hosman did not object to the statements he challenges on appeal, we will reverse on this issue only if Hosman demonstrates plain error. To prevail on a plain error claim, an appellant must show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the

appellant." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (cleaned up).

¶38 Before intervening in a prosecutor's closing argument absent an objection, the district court "must be certain" that a prosecutor's statement is "both highly prejudicial and obviously" wrong. *State v. Hummel*, 2017 UT 19, ¶ 119 & n.35, 393 P.3d 314. Importantly, not "every misstep of counsel in closing amounts to plain error—subject only to proof of prejudice. We must ask first whether counsel's missteps were so egregious that it would be plain error for the district court to decline to intervene sua sponte." *Id.* ¶ 110 (cleaned up). Accordingly, "our plain error analysis asks not whether the prosecutor made a misstep that could be characterized as misconduct, but whether the trial court made an obvious error in its decision." *Id.* ¶¶ 105, 107 (cleaned up). In assessing the egregiousness of the prosecutor's misstep, we must keep in mind that prosecutors have "wide latitude in closing arguments," *State v. Redcap*, 2014 UT App 10, ¶ 32, 318 P.3d 1202, *abrogated on other grounds by Hummel*, 2017 UT 19, and "the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports," *State v. Dibello*, 780 P.2d 1221, 1225 (Utah 1989). Here, none of the prosecutor's statements during closing arguments warranted the district court's intervention sua sponte either to strike the statements or to grant a mistrial.

¶39 Hosman first challenges the prosecutor's argument, "There are no tire skid marks. He did not brake." The accident reconstruction expert testified that "if the vehicle braked . . . , the wheels will leave rubber on the asphalt," but the expert "did not see any braking marks." Hosman points out that there was no "expert testimony given about whether the *lack* of brake marks conclusively demonstrate[d] that Hosman did not apply his brakes." But during closing argument, attorneys "may discuss fully both the evidence and all legitimate inferences arising from the evidence." *State v. Creviston*, 646 P.2d 750, 754 (Utah 1982).

Here, the direct evidence established both that braking will leave rubber from the tires on the asphalt and that the expert saw no braking marks at the scene. The prosecutor's argument that Hosman did not brake to avoid hitting the victim is thus a legitimate and logical inference to be drawn from the direct evidence.

¶40 Hosman next argues that the prosecutor overstepped by suggesting that the damage to the car was indicative of the speed at which Hosman was travelling. The prosecutor commented, "You saw the damage done to this car. You know what caused that, his head. His head. That's how fast he was going." Hosman admitted that he was travelling at approximately thirty-five miles per hour and that the victim's body caused the damage to his car. "[T]he State's closing argument merely asked the jury to make a reasonable inference, based on common sense and deductions drawn from other evidence presented," *see State v. Wright*, 2021 UT App 7, ¶ 86, 481 P.3d 479, that the damage to Hosman's car would not have been so great if he had struck the victim while making a slow left-hand turn. The evidence supported the inference that the damage to the car, which the jury had observed, was related to how fast Hosman was driving when he hit the victim.

¶41 Hosman also challenges the prosecutor's statements about Hosman taking a wide turn. The prosecutor commented, "Because in order to maintain the speed that even [Hosman] says he was at, he couldn't make that kind of turn. I would submit to you that is evidence of the wide turn, which is actually inside the sharp turn. But that's how he can maintain that speed that he needs in order to cause the body to fly the distance that it flies." Hosman argues that "at no point during the trial was expert testimony given about whether Hosman would need to have made a wide turn to maintain his speed." But the prosecutor's statement was a reasonable inference drawn from many pieces of evidence. Several witnesses testified to the

approximate location of the victim when Hosman struck him. Although the exact location varied, each witness placed the victim in the crosswalk in front of the northbound lanes of 3600 West, not the southbound lanes into which Hosman should have been turning. Witness testimony as well as camera footage showed that Hosman moved into the oncoming lane of traffic on 4100 South before turning into the victim. And ample evidence, including Hosman's own admission, supported the conclusion that he was travelling at approximately thirty-five miles per hour when he struck the victim. This evidence supports the inference that moving into the oncoming lane of traffic before making the turn allowed Hosman to cut across the intersection without needing to turn the wheels sharply. In other words, he maintained his speed by making a "wide" turn within "the sharp turn" necessary to strike the victim in the northbound lanes of the 3600 West crosswalk. At the very least, the prosecutor's inference that Hosman had to take a wide turn to maintain his speed was not so highly prejudicial or obviously wrong that the court was required to intervene sua sponte.

¶42 All three of the prosecutor's challenged statements were arguably supported by the evidence at trial and were not "so egregiously false or misleading that the judge had an obligation to intervene by raising an objection sua sponte." *Hummel*, 2017 UT 19, ¶ 119 (cleaned up). Thus, the court did not plainly err when it did not intervene in the absence of an objection.

CONCLUSION

¶43 Because neither the case agent nor the accident reconstruction expert opined on whether Hosman had the required mental state to commit the crime, the court acted within its discretion by denying Hosman's motion for mistrial. In addition, the district court correctly denied Hosman's motion for directed verdict because the State presented sufficient evidence

to prove Hosman's intent to either kill or cause severe bodily harm to the victim. Finally, the court did not plainly err by not intervening in the prosecutor's closing arguments, which were arguably based on the evidence presented. Therefore, we affirm.

_____